UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

L.O., individually and on behalf of K.T., a
child with a disability,

Plaintiff,

- against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

Defendant.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  3/24/15

**MEMORANDUM
OPINION & ORDER**

13 Civ. 3945 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff L.O. brings this action – on behalf of herself and her son, K.T. – against
the New York City Department of Education (the "DOE") for relief pursuant to the Individuals
with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400 et seq. Plaintiff seeks to
overturn a State Review Officer's decision affirming an Impartial Hearing Officer's finding that
the educational program and services that the DOE's Committee on Special Education ("CSE")
recommended for Plaintiff's son were appropriate. The parties have cross-moved for summary
judgment. For the reasons stated below, Defendant's motion will be granted and Plaintiff's
motion will be denied.

## BACKGROUND

### I.    STATUTORY BACKGROUND

"Under the IDEA, states receiving federal funds are required to provide 'all
children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Cent.
Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also
Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). A "free appropriate
public education" ("FAPE") must include "'special education and related services' tailored to

meet the unique needs of a particular child, . . . and be 'reasonably calculated to enable the child to receive educational benefits. . . .'" Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)) (internal citations omitted).

Special education and related services under the IDEA are provided by a school district pursuant to an annual individualized education program ("IEP"). Walczak, 142 F.3d at 122; see also 20 U.S.C. § 1414(d). In New York, local committees on special education ("CSE") are responsible for developing appropriate IEPs. Walczak, 142 F.3d at 123. "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08 (citing N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8, § 200.1(ww)(3)(i)).

Parents who wish to challenge the adequacy of an IEP developed by their local CSE may request an impartial due process hearing before an impartial hearing officer ("IHO") appointed by the local school board. Id. at 108 (citing 20 U.S.C. § 1415(f) and N.Y. Educ. Law § 4404(1)). An aggrieved party may appeal an IHO's decision to a state review officer ("SRO"), and the SRO's decision may be challenged in either federal or state court. Id. (citing 20 U.S.C. §§ 1415(g), (i)(2)(A) and N.Y. Educ. Law § 4404(2)).

2

## II.    FACTS

### A.    K.T.'s Background

K.T. is a nineteen-year-old boy who was diagnosed with autism at age four. (Impartial Hearing Transcript ("Tr.") (Dkt. No. 29) 652-53)  He has also been diagnosed with pervasive developmental disorder, mild mental retardation, obsessive compulsive disorder, mood disorder, asthma, and pica.[1]  (Def. R. 56.1 Stmt. (Dkt. No. 20) ¶ 6)[2]  In 2009, K.T. began attending New York City Public School 811X.  (Tr. 653; Pltf. Ex. 27 (Dkt. No. 29) at 3)  He was placed in the school's "6:1:1 program," which provides for a class consisting of six students, a teacher, and a para-professional.  (Tr. 99; Pltf. Exs. 3 at 1, 5 at 1, 6 at 1 (Dkt. No. 29))  K.T. received special services, including counseling as well as speech, physical, and occupational therapy.  (Pltf. Exs. 3 at 10; 5 at 12; 6 at 12 (Dkt. No. 29))

In September 2010 – when K.T. was assigned a new teacher and moved to a new classroom – he began to engage in self-abusive behavior and to physically and verbally abuse others at school.  (Tr. 131, 655; Pltf. R. 56.1 Stmt. (Dkt. No. 15) ¶ 8)  His self-abusive behaviors include "hitting himself on the head, hitting the table and scratching himself."  (Pltf. Ex. 3 (Dkt. No. 29) at 4)  He also often "puts staples in his mouth, which he finds comforting."  (Pltf. Ex. 25 (Dkt. No. 29) at 2)  In the fall of 2010, K.T. began expressing reluctance to attend school (Tr.

---

[1] "Pica" is defined as "compulsive eating of nonnutritive substances, such as ice . . ., dirt . . ., gravel, flaking paint or plaster, clay, hair . . . , or laundry starch. . . ."  Dorland's Illustrated Medical Dictionary, at 1466 (31st ed. 2007).

[2] Unless otherwise noted, citations to the parties' Local Rule 56 .1 statements concern factual assertions that are admitted or are deemed admitted because they were neither admitted nor denied by the opposing party or have not been contradicted by citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

630-631), and by November 2011, K.T. refused to attend school (Pltf. R. 56.1 Stmt. (Dkt. No. 15) ¶ 3; Tr. 630).

## B.     The IEPs Developed by the CSE

### 1.     December 2009 IEP

On December 2, 2009, the DOE convened a CSE meeting for the purpose of developing an IEP for K.T. for 2010. (Def. R. 56.1 Stmt. (Dkt. No. 20) ¶ 13; Pltf. Ex. 6 (Dkt. No. 29)) Plaintiff L.O. attended the meeting, along with a DOE representative, a special education teacher, a physical therapist, an occupational therapist, a speech therapist, and a counselor. (Pltf. Ex. 6 (Dkt. No. 29) at 2)

At this meeting, the CSE considered recommending K.T. for placement in a general education program in a state-supported public or private school, but determined that "[g]eneral education with the assistance of supplementary aids and services will not provide enough support for [K.T.] to meet his needs." (Id. at 14) Accordingly, the CSE recommended that K.T. be placed in a "[s]pecial class in a specialized school with related services" for a twelve-month school year. (Id. at 1) The CSE found that a classroom with a 6:1:1 student-teacher-paraprofessional ratio would be appropriate. (Id.)

With respect to academic management and emotional needs, the IEP notes that K.T. "benefits from a small [and] highly structured class setting" and "forms of positive reinforcement." (Id. at 3) The IEP also states that, although K.T. "is a friendly young man" and has "improve[d] his social and communication skills" by "learning under the TEACCH methodology,"[3] his behavior "seriously interferes with instruction and requires additional adult

---

[3] The DOE's Treatment for Education of Autistic Children in Communication Skills ("TEACCH") program is designed to help students with autism "maximize independence." (Tr. 101-02)

4

support."  (Id. at 4)  The IEP recommends that K.T. participate in an "Alternative Assessment" program due to the severity of his "deficits in cognitive, communication, and social development."[4]  (Id. at 12)  It also recommends that K.T. continue to receive a number of related services, including speech, physical, and occupational therapy.  (Id.)  The CSE decided to terminate K.T.'s counseling program, however.  (Id. at 2)

    The December 2009 IEP sets forth nine annual goals and 26 short-term objectives for K.T. during 2010.  (Id. at 6-11)  The annual goals include improving his skills in a number of areas, including community awareness, reading, math, handwriting, social interaction, and physical fitness.  (Id.)  The short-term objectives provide methods for K.T. to achieve his goals. For example, the IEP states that K.T. "will read and identify items he likes from a fast food menu 8/10 times over a two week period," in order to develop his reading skills.  (Id. at 6)  Finally, the IEP includes (1) a plan for K.T. to transition to adult living; and (2) a behavioral intervention plan ("BIP"), which describes K.T.'s interference behaviors and provides strategies for changing those behaviors.[5]  (Id. at 15-16)

---

[4]  "The [New York State Alternative Assessment ("NYSAA")] is a datafolio-style assessment in which students with severe cognitive disabilities demonstrate their performance toward achieving the New York State P-12 Common Core Learning Standards in English language arts and mathematics. . . . Eligibility for participation in NYSAA is determined by the [CSE] according to criteria described in the Administrators' Manual.  Student performance is recorded through direct observation and documentation and may include other information such as student work products, photographs, audio and videotapes."  New York State Alternative Assessment (NYSAA), NEW YORK STATE EDUCATION DEPARTMENT, OFFICE OF STATE ASSESSMENT, http://www.p12.nysed.gov/assessment/nysaa/ (last visited Mar. 22, 2015).

[5]  "Behavioral intervention plan means a plan that is based on the results of a functional behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior."  8 NYCRR § 200.1(mmm).

### 2.     December 2010 IEP

K.T. continued to attend his 6:1:1 special class throughout 2010. See Tr. 97-99. On December 20, 2010, the CSE convened for the purpose of developing an IEP for K.T. for 2011. (Pltf. Ex. 5 (Dkt. No. 29); Def. R. 56.1 Stmt. (Dkt. No. 20) ¶ 28) Plaintiff L.O., a DOE representative, a special education teacher, and a speech pathologist attended the meeting. (Pltf. Ex. 5 (Dkt. No. 29) at 2) The CSE recommended that K.T.'s services remain the same as the previous year. (Id. at 1-2) The CSE again considered – and rejected – a general education program for K.T., and recommended that he continue to receive speech, physical, and occupational therapy. (Id. at 11-12)

The December 2010 IEP notes that K.T. "is currently following an alternate assessment curriculum," and recommends that he continue with this program. (Id. at 3, 12) The IEP reports that K.T. "can complete work tasks independently with assistance needed only for redirection and/or task completion," but again comments that K.T.'s behavior "seriously interferes with instruction." (Id. at 3-4). The December 2010 IEP lists new annual goals and short-term objectives, including that "[w]ithin one year, [K.T.] will be able to use the keyboard on a computer to type his name with minimal assistance. . . ." (Id. at 7) The IEP also includes a transition plan and a BIP. (Id. at 13-14)

### 3.     March 2011 IEP

In a January 18, 2011 letter, Plaintiff requested that the DOE re-evaluate K.T. "to ensure [that he] is receiving the appropriate services and is in the appropriate educational setting." (Pltf. Ex. 12 (Dkt. No. 29)) The next day, the school's related services coordinator made a referral to the CSE for a re-evaluation of K.T.'s program (Pltf. Ex. 11 (Dkt. No. 29)), and requested updated speech, language, and physical therapy evaluations (Tr. 569-72). On March 7,

2011, the CSE convened for a review of K.T.'s IEP. (Tr. 115-16; Pltf. Ex. 3 (Dkt. No. 29))
Those present for this meeting included Plaintiff, a DOE representative, a school psychologist,
and a special education teacher. (Pltf. Ex. 3 (Dkt. No. 29) at 2)

        The March 2011 review resulted in no significant changes to K.T.'s educational
program. (Compare id. at 1-11 with Pltf. Ex. 5 (Dkt. No. 29) at 1-14) The March 2011 IEP
notes that the CSE considered placing K.T. in a (1) general education program, (2) 12:1:1 class
in a special school, or (3) 12:1:4 class in a special school, but rejected all of those options
"because they would not meet [K.T.'s] significant academic and social needs." (Pltf. Ex. 5 (Dkt.
No. 29) at 9) The March 2011 IEP also continues to recommend that K.T. participate in the
Alternative Assessment program, and that he receive speech, physical, and occupational therapy.
(Id. at 10) The March 2011 IEP includes a transition plan that is identical to the plan in the
previous IEP. Although the March 2011 IEP indicates that a new BIP was developed for K.T.,
the new BIP is not attached to the IEP. (Id. at 4, 11)

        K.T. continued to attend the 6:1:1 special class through most of 2011. See Pltf.
Ex. 43 (Dkt. No. 29) at 9 (report card indicating that K.T. received a progress update in June
2011). On November 18, 2011, however, K.T. began refusing to attend school. (Pltf. R. 56.1
Stmt. (Dkt. No. 15) ¶ 3; Tr. 630)

## III.  ADMINISTRATIVE PROCEEDINGS

### A.  Plaintiff's Due Process Complaint

        On December 9, 2011, Plaintiff filed a due process complaint requesting an
impartial hearing. (Pltf. Ex. 1 ("Due Process Cmplt.") (Dkt. No. 29); Pltf. R. 56.1 Stmt. (Dkt.
No. 15) ¶ 35) Plaintiff asserted that the school district's CSE did not provide K.T. with a FAPE

7

for 2009, 2010, and 2011. (Due Process Cmplt. Notice (Dkt. No. 29) at 5)  Plaintiff alleged,

inter alia, that

> (1)  the CSE did not appropriately evaluate K.T., and the IEPs "do not reflect reliance on any evaluations or assessments of the student";

> (2)  the IEPs indicated that K.T.'s progress would be monitored using the Brigance assessment, and that he would be evaluated with a "datafolio," but these evaluations did not occur;

> (3)  the DOE did not conduct evaluations "necessary to develop meaningful present levels of performance";

> (4)  the CSE did not develop "meaningful and measurable annual goals";

> (5)  the DOE deprived K.T. of "mandated services for students with autism";

> (6)  the IEPs "identified no instructional methodologies appropriate for a child with [K.T.'s] particular needs";

> (7)  the IEPs "provided neither social skills training nor appropriate goals related to such training";

> (8)  "no functional behavior assessment has ever been conducted, and no behavioral plan has been developed";[6]

> (9)  the DOE "failed to provide adequate speech/language services";

> (10)  the "annual goals do not adequately address the student's particular needs";

> (11)  the CSE did not develop an "appropriate transition plan" to adult living;

> (12)  the DOE did not provide appropriately certified or licensed service personnel to work with K.T.;

> (13)  the DOE did not provide the parent with "meaningful reports on [K.T.'s] progress";

> (14)  the March 2011 IEP did not include any behavioral goals;

---

[6] "Functional behavior assessment means the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." 8 NYCRR § 200.1(r).

(15)   the December 2010 IEP did not identify "any of the accommodations" that
the DOE was to provide K.T. during "alternative assessments";

(16)   a "Vineland-II assessment" conducted on March 7, 2011 was improperly
administered; and

(17)   K.T.'s significant deterioration as a result of inappropriate programming
had led to the need for a residential placement.

(Id. at 5-9)

In her complaint, Plaintiff sought, inter alia, annulment of the March 2011 IEP;

prompt completion of a number of evaluations and a functional behavior assessment; the

immediate development of an appropriate IEP; provision of intensive speech-language therapy

services at least four times per week; review of K.T.'s medical and education records for

purposes of placing him in a residential school designed for students with autism; compensatory

services; and payment of attorney's fees and costs. (Id. at 9-10)

## B.   The Impartial Hearing and the Hearing Officer's Decision

The impartial hearing began on January 10, 2012, and concluded on March 6,

2012, after five days of hearings. The DOE offered testimony from five employees at K.T.'s

school, including (1) Myrna Quinones, [K.T.'s] special education teacher; (2) Eleyna Rivas, the

assistant principal; (3) Charlene Torres, a speech teacher; (4) Kim McPherson, an occupational

therapist; and (5) Charito Labay, a physical therapist. See Tr. 93-553. Plaintiff testified and also

offered testimony from (1) Carol Bufano, a former DOE related services coordinator; (2) Gracie

President, the program manager for Service for the Underserved; and (3) Peter Doran, the

Medicaid Services Coordinator for Services for the Developmentally Challenged. See Tr. 553-

718.

On April 18, 2012, the IHO issued a decision rejecting Plaintiff's challenge to the

appropriateness of K.T.'s 2009, 2010, and 2011 IEPs, and denying Plaintiff's claim for

9

compensatory additional services. (April 18, 2012 IHO Final Decision (Dkt. No. 29) at 25) The

IHO found that "the CSE has offered [K.T.] a FAPE and implemented the program and services

called for in [K.T.'s] IEPs [for 2009, 2010, and 2011]," and thus K.T. "is [not] entitled to

compensatory additional services." (Id. at 18)

> The IHO rejected all of Plaintiff's objections to the IEPs. He found that

(1)   "the CSE had adequate evaluative information [concerning K.T.'s]
      functional, developmental and academic needs upon which to premise its
      programs for the student" for all three school years, and that the "evidence
      offered into the hearing record demonstrates that [K.T.'s] cognitive
      functioning, educational functioning, mental health needs and adaptive
      behavior skills were regularly assessed by the CSE since 2006" (id. at 19);

(2)   K.T.'s "IEPs for the last three academic years established annual goals and
      short-term instructional objectives which were reasonably related to his
      educational deficits" (id. at 20);

(3)   "the absence of specific instructional methodologies from [K.T.'s] IEPs
      for the last three academic years did not impede [his] right to a FAPE" (id.
      at 20-21);

(4)   the "CSE has consistently developed transition plans for [K.T.] over the
      last three . . . academic years" (id. at 22);

(5)   "the CSE's recommended program provided [K.T.] with sufficient
      instructional services to meet his individual speech/language needs" (id.);

(6)   the IEPs' failure to "indicate when periodic reports on [K.T.'s] progress
      toward his annual goals would be provided to the parent . . . did not
      impede [his] right to a FAPE" (id. at 23);

(7)   "where, as here, the [behavioral intervention plans] document a child's
      interfering behaviors and propose strategies . . . to address those
      behaviors, the failure to also conduct [a functional behavior assessment]
      does not amount to a denial of FAPE" (id. at 24); and

(8)   although "the provision of parent counseling and training was not
      memorialized on any of the student's last three . . . IEPs. . . , [this failure]
      did not result in a denial of a FAPE" because "parent counseling and
      training was available at the assigned school" (id.).

## C. **State Review Officer's Decision**

Plaintiff appealed the IHO's decision, arguing that – with respect to each of the three IEPs – (1) there is no evidence that any of K.T.'s evaluations were reviewed by the CSE; (2) the IEPs set forth inappropriate academic and functional goals; (3) the IEPs do not adequately address [K.T.'s] speech-language needs; (4) the CSE did not conduct functional behavior assessments in developing K.T.'s IEPs and did not adequately address K.T.'s behavioral issues; and (5) the IEPs do not indicate the extent to which counseling and training will be provided to K.T.'s parents. (L.O. Petition to SRO (Dkt. No. 29) ¶¶ 52-92) Plaintiff also argued that "the IHO simply ignored the fact that the CSE and the [DOE] never addressed [K.T.'s] refusal to attend school." (Id. ¶ 85)

On March 15, 2013, the SRO affirmed, finding that all three IEPs were properly designed to address K.T.'s educational needs. (Sterne Decl. (Dkt. No. 13), Ex. 1 ("SRO Decision") at 33)

As to Plaintiff's contention that there was no evidence in the IEPs that the CSE had reviewed K.T.'s evaluations, the SRO concluded that "the hearing record contains evaluative materials that, based on their date, existed at the time of each of the CSE meetings." (Id. at 11) With respect to the December 2009 IEP, the SRO noted that the IEP is consistent with several evaluative reports conducted prior to the CSE meeting, including (1) an "October 2008 psychoeducational evaluation report," (2) a "September 2009 comprehensive psychosocial evaluation report," (3) a "December 1, 2009 counseling report," and (4) "reports which document [K.T.'s] participation and progress from summer 2009 through January 2010." (Id. at 11-13 (citing Pltf. Exs. 26-28, 49)) The SRO concluded that "[a]lthough the [DOE] did not show

11

which evaluative information was reviewed during the course of the CSE meeting, the evidence in the hearing record nevertheless supports the IHO's ultimate conclusions." (Id. at 15)

The SRO also found that the December 2010 IEP is consistent with a number of evaluative reports, including (1) comprehensive psychological evaluations of K.T. completed on January 20, 2010 and April 21, 2010; (2) a June 18, 2010 physical therapy progress report; (3) an August 13, 2010 report card; (4) a September 17, 2010 "Student's Strengths-Based Profile"; (5) a Brigance Inventory of Early Development-II test administered on September 21, 2010; (6) a "Student Communication Profile" dated October 8, 2010; (7) a November 1, 2010 report card; (8) an "instructional priority data collection sheet"; and (9) the minutes from a December 3, 2010 "trans-disciplinary meeting [concerning K.T.]." (Id. at 21-24 (citing Pltf. Exs. 16, 21, 24-25, 43, 45-47, 50))

The SRO similarly found that the March 2011 IEP is consistent with a March 1, 2011 teacher evaluation and a March 7, 2011 "VABS-II survey interview report." (Id. at 29-31 (citing Pltf. Exs. 22-23))

As to Plaintiff's contention that the IEPs contained inappropriate goals for K.T., the SRO found that the goals and short-term objectives in the December 2009 and December 2010 IEPs contained "sufficient specificity by which to guide instruction and intervention, evaluate the student's progress, and gauge the need for continuation or revision, and [that] they contained adequate evaluative criteria." (Id. at 16; see also id. at 27) He also concluded that the March 2011 IEP "carried over [certain] goals from the December 2010 IEP" and that "[t]hese goals continued to be appropriately linked to the information reflected in the March 2011 IEP." (Id. at 31)

12

The SRO also rejected Plaintiff's argument that the IEPs did not adequately address K.T.'s speech-language needs. The SRO explained that the December 2009 and December 2010 IEPs recommend continuation of K.T.'s 30-minute speech-language therapy sessions, and that both IEPs include several goals focusing on K.T.'s social communication and language skills. (Id. at 17, 28) The SRO found that the CSE appropriately modeled the December 2010 IEP after the December 2009 IEP based on indications that K.T. had made progress under the December 2009 IEP. (Id. at 28) Similarly, with respect to the March 2011 IEP, the SRO concluded that "it was reasonable in March 2011 to continue the student's speech language services from his December 2010 IEP." (Id. at 31)

As to Plaintiff's contention that the CSE did not consider special factors and interfering behaviors in developing K.T.'s IEPs, the SRO noted that – although the CSE did not develop a functional behavior assessment for K.T. during any of the three school years at issue – "the lack of an FBA does not automatically result in a denial of a FAPE." (Id. at 20) The SRO found that the IEPs "adequately identif[y] the problem behavior and prescribe[] ways to manage it," and that both the December 2009 and December 2010 IEPs include "adequate and appropriate" behavioral intervention plans for K.T. (Id. at 20, 29) The SRO noted that, although the March 2011 IEP does not attach the behavioral intervention plan referenced in that IEP, "the description of the student in the present level of social/emotional performance section of the IEP remained unchanged from the previous IEP." (Id. at 32) The SRO also concluded that K.T.'s refusal to attend school – which began eight months after the March 2011 IEP was formulated – is "not relevant to this proceeding for the purpose of determining whether the preceding March 2011 IEP was appropriate at the time it was formulated." (Id. at 32 n.41)

Finally, as to Plaintiff's complaint that the IEPs do not contain provisions concerning parent counseling and training, the SRO found that the DOE's "failure to incorporate parent counseling and training into [all three] IEP[s] was a violation of State regulation, but it did not rise to the level of a denial of a FAPE to the student." (Id. at 21; see also id. at 29, 32-33) Accordingly, the SRO denied Plaintiff's appeal. (Id. at 33)

### D.    The Instant Action

Plaintiff filed the instant action on June 10, 2013. (Dkt. No. 1) Plaintiff alleges procedural and substantive violations of the IDEA that amount to a deprivation of a FAPE for K.T. Plaintiff also requests that this Court award compensatory education based on the alleged deprivation of a FAPE. (Id. at 7) The parties have cross-moved for summary judgment. (Dkt. Nos. 12, 19)

## DISCUSSION

### I.    STANDARD OF REVIEW

"'The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to independent judicial review.'" M.H. v. New York City Dep't of Educ., 685 F.3d 217, 240 (2d Cir. 2012) (quoting Walczak, 142 F.3d at 129) (internal quotation marks omitted). "In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'" C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 837-38 (2d Cir. 2014) (quoting Gagliardo, 489 F.3d at 112); see also 20 U.S.C. § 1415(i)(2)(C)(iii). However, "'[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'" C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 77

14

(2d Cir. 2014) (quoting Gagliardo, 489 F.3d at 112-13 (internal quotation marks omitted)). "[C]ourts are 'restrained by [their] lack of specialized knowledge and educational expertise; [they] must defer to the administrative decision particularly where the state officer's review has been thorough and careful.'" N.S. v. New York City Dep't of Educ., No. 13 Civ. 7819 (VEC), 2014 WL 2722967, at *6 (S.D.N.Y. June 16, 2014) (quoting M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 138-39 (2d Cir. 2013) (internal quotation marks and alteration omitted)).

        "The deference owed depends on both the quality of the [administrative] opinion and the court's institutional competence." C.F., 746 F.3d at 77 (citing M.H., 685 F.3d at 244) (alteration added and footnote omitted). To determine the quality of an opinion, "'courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.'" M.W., 725 F.3d at 139 (quoting R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012)) (internal quotation marks and citation omitted). The institutional competence question hinges on whether a matter involves "persistent and difficult questions of educational policy," C.L., 744 F.3d at 838 (quotation marks and citation omitted), or "'issues of law, such as the proper interpretation of the federal statute and its requirements.'" N.S., 2014 WL 2722967, at *6 (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005) (alteration omitted)) (internal quotation marks and citation omitted).[7] "[W]here an

---

[7] The Second Circuit has offered guidance as to the circumstances in which a district court should defer to an administrative officer's findings:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. . . . Determinations grounded in thorough and

SRO decision 'is reasoned and supported by the record,' the district court should not disturb it."
Weaver v. Millbrook Cent. Sch. Dist., 812 F. Supp. 2d 514, 521 (S.D.N.Y. 2011) (quoting
Gagliardo, 489 F.3d at 114).

## II.    WHETHER K.T. WAS PROVIDED WITH A
FREE AND APPROPRIATE PUBLIC EDUCATION[8]

"In determining whether an IEP complies with the IDEA, courts make a two-part
inquiry that is, first, procedural, and second, substantive. At the first step, courts examine
whether there were procedural violations of the IDEA, namely, 'whether the state has complied
with the procedures set forth in the IDEA.'" R.E., 694 F.3d at 189-90 (quoting Cerra v. Pawling
Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005)). "The statute is clear, however, that not
every violation of the IDEA'[s] procedural requirements will result in the denial of a FAPE."
R.B. v. New York City Dep't of Educ., No. 12 Civ. 3763 (AJN), 2013 WL 5438605, at *8
(S.D.N.Y. Sept. 27, 2013), aff'd, 589 Fed. Appx. 572 (2d Cir. 2014). "Rather, a procedural
violation will constitute a denial of a FAPE 'only if the procedural inadequacies (i) impeded the
child's right to a free appropriate public education; (ii) significantly impeded the parents'
opportunity to participate in the decisionmaking process regarding the provision of a free
appropriate public education to the parents' child; or (iii) caused a deprivation of educational

---

logical reasoning should be provided more deference than decisions that are not.
And the district court should afford more deference when its review is based
entirely on the same evidence as that before the SRO than when the district court
has before it additional evidence that was not considered by the state agency.

C.F., 746 F.3d at 77, n.7 (quoting M.H., 685 F.3d at 244 (internal citations omitted)).

[8] Before embarking on a review of the SRO's determinations, it must be acknowledged that the
SRO's 33-page, single-spaced opinion carefully and exhaustively addresses Plaintiff's claims,
and is fully "deserving [of] the ordinary level of deference granted to such final state
administrative decisions." R.B. v. New York City Dep't of Educ., 15 F. Supp. 3d 421, 429
(S.D.N.Y. 2014) (citing K.L. ex. rel. M.L. v. N.Y.C. Dep't of Educ., 530 Fed. Appx. 81, 85 (2d
Cir. 2013)), aff'd, No. 13-4187, 2014 WL 5463084 (2d Cir. Oct. 29, 2014).

Case 1:13-cv-03945-PGG   Document 31   Filed 03/24/15   Page 17 of 64

benefits.'" D.B. v. New York City Dep't of Educ., 966 F. Supp. 2d 315, 329 (S.D.N.Y. 2013) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may cumulatively result in the denial of a FAPE[, however,] even if the violations considered individually do not." R.E., 694 F.3d at 190 (citing Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

"Courts then examine whether the IEP was substantively adequate, namely, whether it was 'reasonably calculated to enable the child to receive educational benefit[ ].'" R.E., 694 F.3d at 190 (quoting Cerra, 427 F.3d at 192) (quotation marks and citation omitted). "Pursuant to Second Circuit precedent, an IEP is substantively adequate if it is 'likely to produce progress, not regression and affords the student . . . an opportunity greater than mere trial advancement.'" R.B., 2013 WL 5438605, at *12 (quoting E.S. ex rel. B.S. v. Katonah Lewisboro Sch. Dist., 487 Fed. Appx. 619, 621 (2d Cir. 2012)) (internal quotation marks and citation omitted). "Any substantive inadequacy in a student's IEP results in the denial of a FAPE." Id. (citing M.W., 725 F.3d at 131).

Here, Plaintiff argues that the December 2009, December 2010, and March 2011 IEPs denied K.T. a FAPE because

(1)     the CSE did not actually rely on the evaluative data it had before it in formulating these IEPs (Pltf. Br. (Dkt. No. 16) at 5-8, 13-15, 18);

(2)     the goals listed in the IEPs were not appropriate to address K.T.'s educational needs (id. at 8, 15, 19);

(3)     the IEPs did not adequately address K.T.'s speech and language needs (id. at 8-9, 15-17, 19-20);

(4)     the CSE did not conduct functional behavior assessments to address K.T.'s interfering behaviors and refusal to attend school (id. at 10-12, 20-23); and

(5)     the IEPs did not offer parental training and counseling as required by New York regulations (id. at 12-13, 17-18, 20).

17

Courts have classified all of these alleged violations as procedural. See, e.g., F.B. v. New York City Dep't of Educ., 923 F. Supp. 2d 570, 581-82 (S.D.N.Y. 2013) (treating as possible procedural violation claim that CSE had not considered evaluative material) (quoting Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003)); E.F. v. New York City Dep't of Educ., No. 12-cv-2217 (MKB), 2013 WL 4495676, at *18-19 (E.D.N.Y. Aug. 19, 2013) (determining whether alleged deficiencies in IEP's goals constituted a procedural violation of the IDEA); R.E., 694 F.3d at 194 (finding that an IEP was procedurally inadequate because, inter alia, it did not include "statutorily mandated speech and language therapy"); A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172-73 (2d Cir. 2009) (considering whether the DOE's failure to conduct a functional behavior assessment constituted a procedural violation of the IDEA); R.E., 694 F.3d at 192-93 (finding that the "failure to include parent training in the IEP" constituted a procedural violation of the IDEA, but did not deny the student a FAPE).

Although all of the violations alleged by Plaintiff can be classified as procedural, this Court has considered whether the deficiencies cited by Plaintiff demonstrate either procedural or substantive inadequacy under the IDEA.

## A.    The CSE's Consideration of Evaluative Materials

Plaintiff argues that "[n]o evidence in the record establishes that the CSE reviewed any evaluations in developing [the December 2009, December 2010, and March 2011 IEPs]." (Pltf. Br. (Dkt. No. 16) at 5, 13, 18)  The DOE responds, however, that "[t]he mere fact that the IEP did not record a report's recommendations verbatim cannot be said to mean that the report was not considered," and that "information contained within the reports provided to the CSE exists in the IEPs." (Def. Br. (Dkt. No. 22) at 7)

18

"In developing an IEP, a CSE is required to 'review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or state assessments, and classroom-based observations; and (iii) observations by teachers and related service providers. . . .'" T.G. ex rel. R.P. v. New York City Dep't of Educ., 973 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) (quoting 20 U.S.C. § 1414(c)(1)(A)); see also id. ("The CSE must consider 'the results of the initial evaluation or most recent evaluation of the child [in developing a student's IEP].") (quoting 20 U.S.C. § 1414(d)(3)(A)(iii)); E.A.M. v. New York City Dep't of Educ., No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *9 (S.D.N.Y. Sept. 29, 2012) ("New York state regulations also provide that the CSE 'must consider the results of the initial or most recent evaluation' in developing a student's IEP.") (quoting 8 NYCRR § 200.4(d)(2)).

Here, the SRO found that "[t]here was ample evidence that evaluations had been conducted to identify the student's special education needs from which the student's IEP could be developed," and that "the hearing record contains evaluative materials that, based on their date, existed at the time of each of the CSE meetings." (SRO Decision (Dkt. No. 13) at 11, 15) The SRO further concluded that all three IEPs were "prepared in a manner consistent with information included in the evaluative materials that had been conducted at the time" of the CSE meetings. (Id. at 15; see also id. at 26, 30) The SRO thus concluded that the IEPs sufficiently incorporated evaluative data so as not to deny K.T. a FAPE. (Id. at 15, 26, 30-31) While, as the SRO acknowledged, the record does not indicate what particular evaluative data the CSE considered at each of the IEP meetings at issue, see id. at 15, this Court agrees with the SRO that the absence of these details does not foreclose a finding that the DOE provided K.T. with a FAPE. See F.B., 923 F. Supp. 2d at 581 (although the most recent evaluative report of the

student "was not physically present at the CSE meeting . . . the fact of the update's absence at the meeting does not carry the day"; deferring to the SRO's conclusion that the absence of the report was "of little moment, given [a doctor's] testimony that she 'must have' reviewed the update, and, more important, given the substantial materials in the case supporting the CSE's conclusion"). Accordingly, this Court will review the IEPs at issue to determine whether they demonstrate that the CSE considered sufficient evaluative material to satisfy the requirements of the IDEA.

### 1.    December 2009 IEP

The SRO listed a number of reports and evaluations concerning K.T. that were available to the CSE at the time of the December 2009 IEP meeting, including (1) an October 2008 psycho-educational report (Pltf. Ex. 28 (Dkt. No. 29)); (2) a September 2009 comprehensive psychosocial evaluation (Ptlf. Ex. 27 (Dkt. No. 29)); (3) a December 1, 2009 counseling report (Pltf. Ex. 26 (Dkt. No. 29)); and (4) a series of student progress reports (Pltf. Exs. 49, 51, 52 (Dkt. No. 29)). Plaintiff complains, however, that (1) "the information relied upon by the SRO to show that the December 2009 IEP was consistent with the existing evaluations is generic descriptive materials about the student"; and (2) that the December 2009 IEP lacks certain "important evaluative information" contained in the reports listed by the SRO. (Pltf. Br. (Dkt. No. 16) at 6-7) Having reviewed the December 2009 IEP and the evaluative reports cited by the SRO, this Court finds ample evidence that these reports are reflected in the IEP.

The December 1, 2009 counseling report – which was prepared the day before the December 2, 2009 CSE meeting – recommends that "[w]eekly counseling sessions are counter-indicated, as they increase [K.T.'s] emotional discomfort and he receives limited benefit." (Pltf.

20

Ex. 26 (Dkt. No. 29) at 1)  The December 2009 IEP reflects this recommendation, as it terminates K.T.'s counseling services.  (Pltf. Ex. 6 (Dkt. No. 29) at 2)

        The December 2009 IEP's description of K.T.'s social and emotional performance also tracks the findings of the October 2008 psycho-educational report; both documents state that K.T.'s moods change frequently, that he is very restless, that he often becomes verbally and physically aggressive, and that he engages in self-abusive behavior. Compare Pltf. Ex. 6 (Dkt. No. 29) at 4 with Pltf. Ex. 28 (Dkt. No. 29) at 1.  With respect to K.T.'s academic performance, the December 2009 IEP reflects the October 2008 report's conclusions that K.T. "can count and write numbers 1-10"; that he "has difficulty with basic arithmetic facts"; that he is "able to name colors"; that he can "follow some single verbal commands"; that he "struggles greatly to maintain attention and concentration in order to complete work;" and that he "is resistant to sitting for long periods of time." Compare Pltf. Ex. 6 (Dkt. No. 29) at 3 with Pltf. Ex. 28 (Dkt. No. 29) at 3-4.  The December 2009 IEP also reflects the October 2008 report's findings that K.T. has autism, and that he takes medication to decrease hyperactivity and assist with sleep. Compare Pltf. Ex. 6 (Dkt. No. 29) at 3, 5 with Pltf. Ex. 28 (Dkt. No. 29) at 1.

        Plaintiff argues, however, that the December 2009 IEP does not incorporate important evaluative information from the October 2008 psycho-educational report.  First, she contends that the December 2009 IEP does not contain information concerning K.T.'s scores on a number of psychological tests, all of which were administered in 2006 and reported in the October 2008 report.  (Pltf. Br. (Dkt. No. 16) at 7)  While the December 2009 IEP does not include the specific scores, it does reflect the substantive results of the tests.  For example, the October 2008 report states that these tests "revealed [that K.T.] was functioning in the

21

Profoundly Deficient range in all areas," and that "[s]ignificant support in self-care and daily supervision were recommended." (Pltf. Ex. 28 (Dkt. No. 29) at 3)  The December 2009 IEP notes that "[K.T.] must be observed consistently," that his behavior "requires additional adult support," and that teachers must consistently assess and observe him due to his "[s]everity of deficits in cognitive, communication, and social development." (Pltf. Ex. 6 (Dkt. No. 29) at 4, 12)  The October 2008 report also states that the Stanford-Binet test revealed that K.T. "was able to name colors," that his "[v]ocabulary skills were . . . equivalent to age 3," and that "[w]hen attentive, he was able to follow some single verbal commands." (Pltf. Ex. 28 (Dkt. No. 29) at 3)  As discussed above, these findings correspond with the IEP's descriptions of K.T.'s academic performance.  See Pltf. Ex. 6 (Dkt. No. 29) at 3.  In sum, although the December 2009 IEP does not recite K.T.'s specific scores on these tests, it does convey the substantive results of these tests.

Plaintiff also argues that the December 2009 IEP does not incorporate the October 2008 report's statement that K.T. "would benefit from a 1:1 paraprofessional." (Pltf. Br. (Dkt. No. 16) at 7; Pltf. Ex. 28 (Dkt. No. 29) at 1)  Although the 2009 IEP provides that K.T. will remain in a 6:1:1 classroom, it also indicates that K.T. "works best with one on one instruction[.]" (Pltf. Ex. 6 (Dkt. No. 29) at 3)  Accordingly, the 2009 IEP reflects the finding in the October 2008 report that K.T. would benefit from one-on-one instruction.

Plaintiff's last argument with respect to the October 2008 report is that K.T.'s teacher provided the information about K.T.'s academic performance, and that "the teacher . . . may have independently provided the information to the CSE." (Pltf. Br. (Dkt. No. 16) at 6)  The fact that K.T.'s teacher provided the same information to the author of the October 2008

22

report and to the CSE merely confirms, however, that the CSE relied on accurate evaluative data concerning K.T.'s behavioral issues in formulating the December 2009 IEP.

The December 2009 IEP also tracks information in the September 2009 psychosocial evaluation. The 2009 IEP reflects the psychosocial report's description of K.T.'s psychiatric history and behavioral issues, including that he puts staples in his mouth, is autistic, has gastrointestinal problems, demonstrates self-abusive behaviors, and takes medication for his anxiety and sleeplessness. Compare Pltf. Ex. 6 (Dkt. No. 29) at 3-5 with Pltf. Ex. 27 (Dkt. No. 29) at 4-5. Plaintiff asserts, however, that the December 2009 IEP does not incorporate two pieces of information that are set forth in the September 2009 report: "that K.T. has difficulty in maintaining eye contacts, and has failed to develop peer relationships appropriate to developmental level." (Pltf. Br. (Dkt. No. 16) at 7) Both of these issues are reflected in the 2009 IEP's annual goals and short-term objectives, however. One of the annual goals the IEP sets for K.T. is that, within one year, he "will be able to initiate social conversation with peers, family members or other staff members in his environment." (Pltf. Ex. 6 (Dkt. No. 29) at 11) Similarly, a short-term objective in the 2009 IEP states that "[i]n a year [K.T.] will give eye contact with familiar peers while transitioning from one place to the other four out of five times over a three week period." (Id.) These goals reflect the CSE's consideration of information contained in the September 2009 psychosocial report.

Plaintiff contends, however, that the September 2009 report "notes that K.T. requires assistance in 'cleaning himself after using the toilet[,]' an important management need that is not recorded in the December 2009 IEP." (Pltf. Br. (Dkt. No. 16) at 7 (quoting Pltf. Ex. 27 (Dkt. No. 29) at 3)) Plaintiff adds that she testified at the impartial hearing that K.T. was not independent with his toileting, but that the DOE's occupational therapist "was not even aware

that K.T. has difficulties in toileting."[9] (Id. (citing Tr. 680 (L.O testimony); Tr. 457 (McPherson testimony))

The failure of the December 2009 IEP to include a reference to K.T.'s toileting issues did not deny K.T. a FAPE, however. The IEP provides an annual goal for K.T. that reflects his need to improve his daily living skills: "Within a year, [K.T.] will improve fine motor skills necessary for performing [activities of daily living] and [s]chool activities as evidenced by demonstrating his ability to tie his shoe laces[. . . , and he will] develop a mature grasp pattern. . . ." (Pltf. Ex. 6 (Dkt. No. 29) at 10) Although the IEP does not mention toileting as an area that requires improvement, the IEP as a whole reflects the evaluative information available to the CSE at the time of the December 2009 meeting. See F.B., 923 F. Supp. 2d at 582 ("[The IDEA] does not require that the [CSE] team review every single item of data available, nor has case law interpreted it to mean such.").

This Court concludes that the December 2009 IEP was based on sufficient evaluative data. Although the CSE did not list each report and evaluation it relied on in formulating K.T.'s December 2009 IEP, there is ample evidence that the 2009 IEP reflects the available evaluations and reports. Accordingly, this Court will not disturb the SRO's finding with respect to the sufficiency of the evaluative data relied on by the CSE in formulating K.T.'s December 2009 IEP.

---

[9] The DOE argues that Plaintiff waived this argument by not raising it in her petition to the SRO. (Def. Br. (Dkt. No. 22) at 8) Although Plaintiff's SRO petition does not cite the IEP's failure to address K.T.'s toileting issues, her accompanying memorandum of law argues that K.T.'s toileting "is an area that should have been addressed, both in [his] IEP goals and by his occupational therapist." (Pltf. SRO Petition Br. (Dkt. No. 29) at 8) Given these circumstances, this Court will not find that Plaintiff has waived this issue.

2.     **December 2010 IEP**

The SRO likewise listed a number of reports that were available to the CSE at the

time it prepared the December 2010 IEP, and explained how that IEP is consistent with the

information in those reports.  (SRO Decision (Dkt. No. 13) at 21-26)  These reports include:  (1)

results from a comprehensive psychological evaluation that was performed in January and April

2010 (Pltf. Ex. No. 25 (Dkt. No. 29)); (2) a June 18, 2010 physical therapy progress report (Pltf.

Ex. 50 (Dkt. No. 29)); (3) an August 13, 2010 report card (Pltf. Ex. 47 (Dkt. No. 29)); (4) a

September 17, 2010 strengths-based profile (Pltf. Ex. 46 (Dkt. No. 46)); (5) a September 21,

2010 Brigance diagnostic inventory (Pltf. Ex. 21 (Dkt. No. 29)); (6) an October 8, 2010 student

communication profile (Pltf. Ex. 24 (Dkt. No. 29)); (7) a November 2010 report card (Pltf. Ex.

45 (Dkt. No. 29)); (8) an instructional priority data collection sheet from November and

December 2010 (Pltf. Ex. 43 (Dkt. No. 29)); (9) minutes from a December 3, 2010 trans-

disciplinary meeting concerning K.T. (Pltf. Ex. 16 (Dkt. No. 29)); and (10) a New York State

Alternative Assessment report (Pltf. Ex. 48 (Dkt. No. 29)).[10]

These reports indicate that K.T. continued to exhibit the same behavior and

conditions documented in the previous year's IEP and evaluations.  The reports state that K.T.

suffers from autism, moderate mental retardation, and self-abusive behaviors (Pltf. Ex. 25 (Dkt.

No. 29) at 1-2, 5; Pltf. Ex. 46 (Dkt. No. 29)); that he has difficulty concentrating and maintaining

eye contact (Pltf. Ex. 25 (Dkt. No. 29) at 2); that he can usually follow one-step commands (id.

---

[10]  At the impartial hearing, Plaintiff testified that she did not receive speech-language,
occupational, or physical therapy progress reports for K.T. during 2011.  (Tr. 683)  The SRO
found, however, that the record contains reports of K.T.'s progress related to all of his goals
except as to occupational therapy.  (SRO Decision (Dkt. No. 13) at 24)  In any event, Plaintiff's
alleged lack of access to these reports did not "result in a reduction of or termination of related
services for the student," because the CSE formulated an IEP that provided for K.T. to receive
speech-language, occupational, and physical therapy services.  (Id.)

at 2, 4); and that he lacks coordination and muscle strength (Pltf. Ex. 50 (Dkt. No. 29) at 1-2).
The reports also describe K.T.'s then-current language skills, indicating that he responds to
gestures but requires high-level prompts, and that he understands objects, manual signs, and
spoken sentences. (Pltf. Ex. 24 (Dkt. No. 29) at 1)  With respect to K.T.'s expressive language
skills, the reports indicate that K.T. is aggressive and bangs on the table, but can "purposefully
communicate[] with others" using spoken words or symbols. (Id. at 1-2)  The record also
includes a report card – which is signed by both K.T.'s mother and his teacher – that assesses
K.T.'s performance with respect to the goals included in the December 2009 IEP. (Pltf. Ex. 45
(Dkt. No. 29) at 1-10)  The report card indicates that K.T. made progress on all of his goals
between January and August 2010, but that he made little to no progress during November 2010.
(Id.)  An "instructional priority data collection sheet" indicates, however, that K.T. made some
progress during November and December 2010 towards reaching certain goals relating to his
language, math, social studies, communication, and gross motor skills. (Pltf. Ex. 43 (Dkt. No.
29) at 1-2)

   The record also reflects a December 3, 2010 meeting of K.T.'s teacher, physical
therapist, and occupational therapists at which K.T.'s goals for the new year were discussed.
(Pltf. Ex. 16 (Dkt. No. 29); Tr. 178-79)  The meeting minutes indicate that K.T.'s previous goals
were aimed at increasing his communication and socialization skills.  The meeting attendees
agreed that the upcoming IEP should focus on vocational goals and "work task activities." (Pltf.
Ex. 16 (Dkt. No. 29) at 1)  The minutes also state that there is no need for a change in K.T.'s
overall program. (Id.)

   The December 2010 IEP reflects the information contained in these materials.
For example, the December 2010 IEP states that K.T. "communicates using short sentences and

phrases"; that he "can follow 1 and 2 step directions, however he requires close supervision to redirect his attention and remain focused"; that he "sometimes displays anger and/or negative behavior and may become verbally abusive and/or self-abusive"; and that he often "bang[s] [his] fists on tables." (Pltf. Ex. 5 (Dkt. No. 29) at 3-5, 14) The December 2010 IEP also contains goals that reflect the concerns described in the reports. Several of the goals are directed towards improving K.T.'s social and communication skills, including: "When shown a picture of a classmate, during a group activity, [K.T.] will go over to that student and greet them by shaking their hand, with prompting and verbal cues. . . ." (Id. at 6) The goals also focus on K.T.'s fine motor skills; for example, the IEP provides that K.T. will be able to "use the keyboard on a computer to type his name with minimal assistance" within one year, and that he "will be able to tie his shoes performing the last two steps . . . with 2-3 verbal cues and gesture cues. . . ." (Id. at 8) The December 2010 IEP also challenges K.T. to "develop his overall aerobic fitness level," and to "comply and cooperate in [occupational therapy] activities with [the] use of self-calming and relaxation techniques." (Id. at 8-9) Finally, the "transition plan" included in the 2010 IEP focuses on vocational goals, including that K.T. "will learn community signs for use in the community with adult supports"; that he "will participate in functional skills activities such as setting the table, [and] washing/drying dishes"; and that he "will learn various work task activities such as sorting and matching." (Id. at 13)

Plaintiff argues, however, that "the information cited by the SRO is generally generic information about the student that could have simply been carried over from the prior IEP," and that accordingly the SRO erred in finding that the December 2010 IEP was based on sufficient evaluative information. (Pltf. Br. (Dkt. No. 16) at 13-14) Plaintiff notes, for example, that the "IEP lacks any reference to the scores on the Stanford-Binet and the Vineland Adaptive

Behavior Scales set forth in the 2010 psychoeducational evaluation, and makes no reference to [K.T.'s] diagnosis of obsessive-compulsive disorder." (Id. at 14)  The results from the Stanford-Binet test – which measures cognitive functioning – indicate, in part, that K.T. has difficulty "identifying absurd or missing details in pictorial material"; "solving simple addition and subtraction problems"; and "using his short-term memory to immediately recall . . . short sentences with few errors." (Pltf. Ex. 25 (Dkt. No. 29) at 3)  The results from the Vineland Adaptive test – which measures adaptive behavior functioning – indicate, in part, that K.T. "sometimes has difficulty following two-step directions"; that he "can . . . identify some letters from the alphabet"; that he "can dress himself[, but] he requires assistance when brushing his teeth, washing his face and showering"; that he "will clear his own place from the table, but he does not wash dishes"; that he "does not show interest in others his age and does not demonstrate friendship seeking behaviors"; and that he "does not respond appropriately to reasonable changes in routine." (Id. at 3-4)

Although the December 2010 IEP does not list K.T.'s scores on the Stanford-Binet or Vineland Adaptive tests, the IEP reflects the substantive results of those tests.  The December 2010 IEP states, for example, that K.T. "communicates using short sentences and phrases to express his wants and needs"; "can identify colors, shapes, and numbers up to 10"; "can follow 1 and 2 step directions, however he requires close supervision to redirect his attention and remain focused"; can improve his cognitive deficiencies by "sort[ing] pictures of food and clothing in the proper category"; can "follow a daily picture schedule with verbal prompting"; requires "instruction/reinforcement of social skills and modeling of social skills"; and "displays anger and/or negative behavior and may become verbally abusive and/or self-abusive when he becomes frustrated, irritated or when he is 'caught' doing something." (Pltf.

Ex. 5 (Dkt. No. 29) at 3-4, 6)  Although the December 2010 IEP does not incorporate every piece of information from the evaluative reports – including K.T.'s diagnosis of obsessive compulsive disorder – it does reference much of the information in those reports.

Plaintiff next argues that the December 2010 IEP "simply carries over all the services recommended by [the December 2009 IEP]," which "was not reasonably calculated to allow K.T. to actually achieve any of his IEP goals." (Pltf. Br. (Dkt. No. 16) at 14 (emphasis in original) (pointing out that the progress reports in the record indicate that K.T. had not achieved any of his goals by December 2010))  Although the December 2010 IEP does not modify K.T.'s overall program – and adopts several of the goals set forth in the December 2009 IEP – it makes a number of changes that reflect the DOE's commitment to improving K.T.'s vocational skills for 2011.

The December 2010 IEP does not repeat the 2009 IEP's goals relating to K.T.'s math, reading, and handwriting skills, but instead sets goals that address functional activities that will prepare K.T. for life after graduation, such as "set[ting] the table in preparation for a snack," "us[ing] the keyboard on a computer to type his name," tying his shoes, and "develop[ing] his overall aerobic fitness level." (Pltf. Ex. 5 (Dkt. No. 29) at 6-8)  This transition to functional goals is consistent with the testimony of K.T.'s teacher, who stated that many students "reach a plateau" in their academic skills, and that although the teachers "continue to work with them as much as possible academically," they also "do many functional activities to prepare them for independence when they eventually graduate and leave the program." (Tr. 109)  In sum, although the overall program recommended in the December 2010 IEP is similar to the program in the December 2009 IEP, the December 2010 IEP includes a number of significant changes that reflect K.T.'s evolving needs.

Moreover, the fact that K.T. did not meet all of the goals outlined in the December 2009 IEP does not demonstrate that the 2009 IEP was inappropriate. The student progress reports in the record indicate that K.T. had achieved a number of goals and was making significant progress towards achieving others, despite his slight regression in December 2010. See Pltf. Ex. 45 (Dkt. No. 29). K.T.'s overall progress in 2010 indicates the appropriateness of the goals reflected in the December 2009 IEP, and the CSE appears to have taken these results into account in developing the December 2010 IEP. As discussed above, the December 2010 IEP sets new goals that focus more on functional activities than on academic improvement.

Finally, Plaintiff argues that the December 2010 IEP is deficient because it does not document K.T.'s then-current functional academic level, and because the hearing record does not indicate whether a vocational assessment of K.T. was completed prior to the development of the 2010 IEP. (Pltf. Br. (Dkt. No. 29) at 14) These deficiencies did not deny K.T. a FAPE, however. While the IEP does not list K.T.'s functional academic level, it notes that he "is currently following an alternate assessment curriculum," and describes the tasks he can perform, including that he "can identify colors, shapes and numbers up to 10"; "can follow 1 and 2 step directions"; "can complete many work task activities throughout the day"; "can recognize many pictures and symbols"; and "has the ability to complete a color, cut and paste activity independently." (Pltf. Ex. 5 (Dkt. No. 29) at 3) With respect to the absence of a vocational assessment, it appears that the DOE performed such an assessment during the 2009-10 period. (Tr. 690 (Plaintiff's testimony indicating that she "vaguely remember[s] filling out a form . . . that was sent home [regarding a vocational assessment] at least once, maybe twice" between 2009 and 2010)) More importantly, the December 2010 IEP's focus on the need to improve K.T.'s functional abilities – and its description of his current abilities – indicates that the CSE

took his vocational skills into account in preparing the IEP. Several of the reports in the record –
including the Vineland Adaptive test results and the student strengths-based profile, see Pltf. Exs.
25, 46 (Dkt. No. 29) – provide sufficient information about K.T.'s functional skills for the CSE
to set appropriate vocational goals. Accordingly, this Court concludes that the record supports
the SRO's finding that the "statement of [K.T.'s] special education needs in the December 2010
IEP was consistent overall with information that was reflected in evaluative materials that had
been completed at the time of the December 2010 CSE meeting." (SRO Decision (Dkt. No. 13)
at 26)

### 3.   March 2011 IEP

With respect to the March 7, 2011 IEP, K.T.'s teacher testified that the school
psychologist "gave [K.T.] a battery of tests and those [tests] were discussed at the [March 2011
CSE meeting]." (Tr. 136-37)  Although only two of those tests are included in the record – a
March 1, 2011 teacher evaluation (Pltf. Ex. 23 (Dkt. No. 29) and a March 7, 2011 Vineland-II
Adaptive Behavior Scales survey interview report (Pltf. Ex. 22 (Dkt. No. 29) – other documents
reflecting K.T.'s progress towards the goals listed in the December 2010 IEP are part of the
record.  For example, a February 2011 progress report indicates that K.T. had made "little
progress" towards meeting the December 2010 IEP's annual goals.  (Pltf. Ex. 38 (Dkt. No. 29) at
3-4)  This report explains that K.T. needs more time to meet these goals, and that his teacher
anticipates that he will achieve these goals.  (Id.)  Another progress report indicates that – with
respect to K.T.'s language, math, social studies, science, community development, gross motor,
and fine motor skills – K.T. has "made progress" but has not yet met his goals as of February
2011.  (Pltf. Ex. 43 (Dkt. No. 29) at 3-5)

The March 1, 2011 teacher evaluation describes K.T.'s (1) language and communication skills; (2) general strengths, weaknesses, and needs; and (3) daily living skills. (Pltf. Ex. 23 (Dkt. No. 29) at 1)  The teacher reports that K.T. "communicates using short sentences and phrases to express exactly what he wants"; "can follow 2 step directions with minimal prompting"; "can recognize and match many pictures and symbols"; and "can identify color, shapes, and numbers up to 10."  (Id.)  With respect to K.T.'s weaknesses and needs, the report indicates that he "requires close supervision to redirect his attention and remain focused on his tasks," and that he "benefits most when lessons are presented using visual cues and verbal prompting when addressing his academic needs and daily needs."  (Id.)  With respect to his daily living skills, the report states that K.T. "is independent in [performing] all [daily living] skills," including eating, drinking, using the bathroom, and washing his hands.  (Id.)

The March 7, 2011 survey interview report describes the results of K.T.'s Vineland-II Adaptive Behavior Scales test, which measures "an individual's typical performance of the day-to-day activities required for personal and social sufficiency."  (Pltf. Ex. 22 (Dkt. No. 29) at 3)  The report indicates that K.T.'s adaptive level is in the low range of functioning – i.e., his percentile rank is less than one – for all domains assessed, including communication, daily living skills, and socialization.  (Id. at 2)  The survey did not test K.T.'s gross or fine motor skills.  (Id.)

The progress reports, teacher evaluation, and Vineland-II survey interview report all indicate – not surprisingly – that K.T.'s skills and needs did not change substantially between the preparation of the December 10, 2010 IEP and the March 7, 2011 CSE meeting.  Moreover, the March 2011 IEP tracks the information set forth in these reports and evaluations.  The March 2011 IEP notes that K.T. "can identi[f]y colors, shapes and numbers up to 10"; that he "can

32

follow 1 and 2 step directions"; that he "benefits from a small and highly structured class setting" and from the use of "prompts and [cues] to alert his atten[tion]"; and that he has "severe cognitive and social deficits." (Pltf. Ex. 3 (Dkt. No. 29) at 3, 10)  The March 2011 IEP provides that K.T. will continue to receive speech, physical, and occupational therapy with the same frequency and duration set forth in the December 2010 IEP, and the March 2011 IEP carries over many of the same goals listed in the December 2010 IEP.[11]  Compare id. at 6-7, 10 with Pltf. Ex. 5 (Dkt. No. 29) at 6-9, 12.

Plaintiff points out, however, that K.T.'s teacher "testified that she could recall no evaluative material being reviewed at the March 7, 2011 IEP meeting." (Pltf. Br. (Dkt. No. 16) at 18)  At the impartial hearing, K.T.'s teacher – Myrna Quinones – testified that she could not recall discussing K.T.'s expressive skills, adaptive functioning, daily living skills, or socialization skills at the March 2011 CSE meeting. (Tr. 139-40)  Quinones also testified, however, that the school psychologist "gave [K.T.] a battery of tests and those [test results] were discussed at the meeting." (Tr. 137)  Accordingly, although Quinones does not recall discussing particular skills of K.T. at the CSE meeting, she does recall discussing evaluative materials that addressed his skills.

Plaintiff also contends that the March 1, 2011 teacher evaluation is "false," because it indicates that K.T. is independent in all activities of daily living, including toileting and hand-washing, while testimony at the impartial hearing demonstrates that K.T. is not independent in toileting. (Pltf. Br. (Dkt. No. 16) at 18)  Although Plaintiff testified that K.T. was

---

[11]  The goals carried over include computer usage, social pragmatic skills, and sorting skills. Compare Pltf. Ex. 5 (Dkt. No. 29) at 6-7 with Pltf. Ex. 3 (Dkt. No. 29) at 6-7.  For reasons that are not clear, occupational and physical therapy-related goals were not carried over, although the March 2011 IEP continues to provide for these services.  See Pltf. Ex. 3 (Dkt. No. 29) at 10.

not independent in toileting as of the March 6, 2012 hearing (Tr. 680), other documents in the

record corroborate the March 1, 2011 teacher evaluation's assessment of K.T. as being

independent in his daily living skills between late 2010 and late 2011.  For example, a September

2010 student strengths-based profile indicates that K.T. is independent in all activities of daily

living, including toileting (Pltf. Ex. 46); and a December 2011 annual review plan states that

K.T. "is independent with most [daily living] skills," but that he has "some difficulty with shoe

tying" (Pltf. Ex. 36 (Dkt. No. 29) at 1).  Moreover, the hearing record suggests that K.T. was

"regressing" – both with respect to his speech abilities and his overall behavior – during 2012.

(Tr. 713)  Accordingly, although Plaintiff testified that K.T. was not independent in toileting at

the time of the March 2012 impartial hearing, other documents in the record demonstrate that

K.T. was independent in his daily living skills, including toileting, in previous years.

Finally, Plaintiff complains that, "[d]espite the acknowledged fact that the

'current report card/progress report and instructional data collection sheets indicated that the

student was earning ratings of "little progress made,"' the CSE elected not to increase the

intensity of K.T.'s services." (Pltf. Br. (Dkt. No. 16) at 18 (citing SRO Decision (Dkt. No. 13) at

30-31)  As noted above, it is not surprising that a February 2011 progress report states that K.T.

has not yet accomplished annual goals set two months earlier.  Given that K.T.'s teacher stated

that K.T. simply needed more time to achieve these goals, this is not evidence of an improper

IEP.  See Pltf. Ex. 42 (Dkt. No. 29) at 1; S.H. ex rel. W.H. v. Eastchester Union Free Sch. Dist.,

No. 10 Civ. 03927 (KMW), 2011 WL 6108523, at *10 (S.D.N.Y. Dec. 8, 2011) ("Although past

progress is not dispositive, it does 'strongly suggest that' an IEP modeled on a prior one that

generated some progress was 'reasonably calculated to continue that trend.'") (quoting

Thompson R2–J Sch. Dist. v. Luke P. ex rel. Jeff P., 540 F.3d 1143, 1153 (10th Cir. 2008)).

In sum, the CSE's decision to carry over to the March 2011 IEP many of the same goals that were listed in the December 2010 IEP did not deny K.T. a FAPE.

*          *          *          *

Although the record does not indicate what specific evaluative material the CSE reviewed during the December 2009, December 2010, and March 2011 IEP meetings, the record supports the SRO's conclusion that all of the IEPs are consistent with evaluative material available to the CSE at the time of these meetings. Indeed, as discussed above, the IEPs reference many of the findings of these evaluative reports and tests. Accordingly, even assuming arguendo that the failure to cite specific evaluative materials rise to the level of a procedural violation of the IDEA, the IEPs did not deny K.T. a FAPE.

## B.    The Goals Listed in the IEPs Were Appropriate

Plaintiff argues that the goals in all three IEPs were not appropriate to address K.T.'s educational needs, and thus denied him a FAPE. (Pltf. Br. (Dkt. No. 16) at 8, 15, 19) "The IDEA requires an IEP to include 'a statement of measurable annual goals, including academic and functional goals.'" R.B. v. New York City Dep't of Educ., 15 F. Supp. 3d 421, 433 (S.D.N.Y. 2014) (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. 300.320(a)(2); 8 NYCRR 200.4(d)(2)(iii)), aff'd, No. 13-4187, 2014 WL 5463084 (2d Cir. Oct. 29, 2014). "Each annual goal must additionally include 'evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal.'" Id. (citing 8 NYCRR § 200.4(d)(2)(iii)(b); 20 U.S.C. § 1414(d)(1)(A)(i)(III)). The goals must "be designed . . . 'to enable the child to be involved in and make progress in the general education curriculum' and to 'meet each of the child's other educational needs that result from the child's disability.'" C.H. v.

35

Goshen Cent. Sch. Dist., No. 11 Civ. 6933 (CS), 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)).

"In this Circuit, courts are 'reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.'" J.L. v. City Sch. Dist. of City of New York, No. 12 Civ. 1516 (CM), 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20, 2013) (citing P.K. v. N.Y. City Dept. of Education, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011); R.R. v. Scarsdale Union Free School District, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009)). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." Grim, 346 F.3d at 382. However, an SRO's "conclusory" statement – for example, that the goals in an IEP "comprehensively addressed the student's needs in [certain] areas" – "does not evince thorough and well-reasoned analysis that would require deference." M.H., 685 F.3d at 249 (quotation marks omitted).

### 1.    December 2009 IEP Goals and Objectives

The December 2009 IEP sets goals in the areas of "academics, community awareness, social interaction, gross and fine motor skills, and social conversation skills." (SRO Decision (Dkt. No. 13) at 15)  The SRO concluded that these goals were appropriate in light of K.T.'s needs at that time.  (Id. at 15-16)  Although the annual goals are broad – e.g., "[w]ithin a year, [K.T.] will develop his math skills with 80% accuracy as measured by teacher made activities" (Pltf. Ex. 6 (Dkt. No. 29) at 8) – the IEP provides specific and detailed short-term objectives.  See A.D. v. New York City Dep't of Educ., No. 12 Civ. 2673 (RA), 2013 WL 1155570, at *10 (S.D.N.Y. Mar. 19, 2013) ("The Court . . . finds that the IEP's goals were sufficiently measurable.  Each annual goal did indeed have more particular, objectively

36

measureable short-term objectives or goals."). For example, to accomplish the annual goal of "develop[ing] overall fitness level to improve [K.T.'s] performance in school activities," the IEP includes, inter alia, the objective that K.T. "will be able to perform gross motor skills by catching and throwing a medium sized ball with 2-3 step instructions, 4-5 feet away, 4/5 attempts [in order] to develop upper extremity muscles within a 2-month period." (Id. at 9)  The IEP also specifies how often K.T.'s progress with respect to each of the goals will be measured and reported.[12]  (Id. at 6-11)

      Plaintiff argues that the goals in the December 2009 IEP "fail to address K.T.'s needs in toileting, his behaviors, and his pica, which causes him to eat foreign objects, such as staples." (Pltf. Br. (Dkt. No. 16) at 8)  As discussed above, although the December 2009 IEP does not specifically mention toileting, it does include the following annual goal:  "Within a year, [K.T.] will improve fine motor skills necessary for performing [activities of daily living] and [s]chool activities. . . ." (Pltf. Ex. 6 (Dkt. No. 29) at 10)  Moreover, although the IEP does not include goals specifically related to K.T.'s pica, it indicates that K.T. "engages in self-abusive behaviors such as . . . eating staples" and notes that he "must be observed consistently." (Id. at 4)  Keeping in mind that the IDEA "does not require states to 'maximize the potential of handicapped children,' . . . [but rather to] provide such children with 'meaningful access' to education," Frank G. v. Board of Educ., 459 F.3d 356, 364 (2d Cir. 2006) (quoting Rowley, 458 U.S. at 213; Walczak, 142 F.3d at 133), this Court concludes that the record supports the SRO's finding that the December 2009 IEP sets forth goals that align with K.T.'s needs at that time.

---

[12]  The last goal in the December 2009 IEP does not include the frequency with which K.T.'s progress will be measured and reported. (Pltf. Ex. 6 (Dkt. No. 29) at 10)  The SRO directed the DOE to correct this omission. (SRO Decision (Dkt. No. 13) at 16)

2.    **December 2010 IEP Goals and Objectives**

With respect to the December 2010 IEP, the SRO noted – as discussed above – that "the CSE did not continue annual goals and short-term objectives which addressed academics and that, . . . consistent with the student's transition plan, the new goals and objectives placed [a] greater degree of focus on the development of functional skills." (SRO Decision (Dkt. No. 13) at 26-27)  This Court agrees that the seven annual goals and eighteen short-term objectives in the December 2010 IEP – which include setting the table, sorting pictures of food and clothing, using a computer keyboard to type one's name, tying shoes, developing an overall fitness level, and using self-calming and relaxation techniques – are consistent with K.T.'s needs as reflected in the IEP and in the contemporaneous evaluative material.  (Pltf. Ex. 5 (Dkt. No. 29) at 6-9)  Moreover, as with the goals in the December 2009 IEP, the December 2010 goals are sufficiently specific and include evaluative schedules requiring that K.T.'s progress be measured throughout the year.  See, e.g., id. at 6 (to achieve the annual goal of sorting pictures of food and clothing in the proper category, K.T. will, inter alia, "place all pictures of the same category together given verbal cues and teacher prompts, in 4/5 trials as measured by classroom teacher[ ] and staff through observation and data collection [with progress] evaluated every 2 weeks").

Plaintiff argues, however, that because "there is no evidence that the CSE reviewed any progress reports or evaluative material in preparing the IEP's present levels of performance . . . , a blanket removal of [academic] goals based on no evaluative material cannot be reasonably calculated to offer educational benefit." (Pltf. Br. (Dkt. No. 16) at 15 (emphasis in original))  As discussed above, however, the CSE did in fact consider the relevant reports and evaluative materials in formulating the 2010 IEP.  Moreover, the focus on functional goals in the December 2010 IEP is consistent with evaluative information available at the time of the CSE

38

meeting, which indicated that K.T. should focus on improving his functional and vocational skills. See, e.g., Pltf. Ex. 16 (Dkt. No. 29) at 1; Tr. 109. Accordingly, the record supports the SRO's conclusion that "the December 2010 IEP['s] annual goals and short-term objectives were appropriate and adequately addressed the student's needs." (SRO Decision (Dkt. No. 13) at 27; see also S.A. ex rel. M.A.K. v. New York City Dep't of Educ., No. 12 Civ. 435 (RMM) (MDG), 2014 WL 1311761, at *15 (E.D.N.Y. Mar. 30, 2014) (finding "no reason . . . to disturb the SRO's finding that the IEP goals were appropriate," where the "SRO found that the IEP's annual goals and short[-]term objectives were clearly linked to the student's needs and abilities, which the IEP accurately described," and where the "SRO also found that these goals and objectives contained sufficient specificity to guide instruction, evaluate the student's progress, and gauge his need for any continuation or revision")).

### 3.   March 2011 IEP Goals and Objectives

The March 2011 IEP includes three annual goals and nine short-term objectives. (Pltf. Ex. 3 (Dkt. No. 29) at 6-7) As the SRO noted, "the March 2011 IEP carried over the[se] goals from the December 2010 IEP," and the goals "addressed [K.T.'s] ability to use a computer to type his name, his social pragmatic skills, and his sorting skills." (SRO Decision (Dkt. No. 13) at 31) However, despite the March 2011 IEP's recommendation that K.T. continue occupational and physical therapy, that IEP does not carry over the goals in the December 2010 IEP that relate to certain occupational and physical skills. For example, the March 2011 IEP does not continue to recommend that K.T. learn to tie his shoes, that he develop his overall aerobic fitness level, or that he use self-calming and relaxation techniques. Compare Pltf. Ex. 5 (Dkt. No. 29) at 6-9 with Pltf. Ex. 3 (Dkt. No. 29) at 6-7. Moreover, the March 2011 IEP does not indicate how often the DOE will report on K.T.'s progress during 2011. See Pltf. Ex. 3 (Dkt.

No. 29) at 6-7 (leaving blank statement that "[t]here will be ___ reports of progress this school year").

The SRO does not explain why it was unnecessary for the CSE to include goals relating to K.T.'s occupational and physical skills in the March 2011 IEP, given that "the hearing record does not reflect that [K.T.'s] needs related to these areas [i.e., occupational and physical therapy] had changed or that [K.T.] had met these goals at the time of the March 2011 CSE meeting." (SRO Decision (Dkt. No. 13) at 31)  The SRO likewise does not explain – as to the goals listed in the March 2011 IEP – why it was appropriate for the CSE not to indicate the frequency with which K.T.'s progress would be reported.  Despite these omissions from the March 2011 IEP, however, this Court agrees with the SRO's conclusion that the March 2011 IEP did not deny K.T. a FAPE.

First, the failure to state how often K.T.'s progress would be reported does not constitute a procedural violation of the IDEA.  Although the March 2011 IEP does not indicate the number of progress reports that would be issued that year, each individual goal and objective indicates the frequency with which, and the method by which, K.T.'s progress would be measured.  For example, the annual goal relating to typing on the computer states that "[p]rogress will be measured using data collection and observation every 2 weeks," and the short-term objective relating to placing pictures in categories states that "[d]ata will be collected at the end of each marking period in the form of data collection sheets by the teacher." (Pltf. Ex. 3 (Dkt. No. 29) at 6-7)  Because "the IEP contains detailed and objective standards by which [K.T.'s] progress can be measured on both an annual and short-term basis," R.B., 15 F. Supp. 3d at 433-34, this Court finds that the March 2011 IEP satisfies the requirement that an IEP's goals

include "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal." 8 NYCRR § 200.4(d)(2)(iii)(b).

This Court finds, however, that the DOE committed a procedural violation of the IDEA by not including goals in the March 2011 IEP that address certain of K.T.'s occupational and physical needs. An IEP's goals must be designed "to meet the child's needs that result from the disability." E.F., 2013 WL 4495676, at *18 (internal quotation marks and citation omitted). As discussed above, the record indicates little change in K.T.'s needs between December 2010 and March 2011, and there is no evidence that K.T. had achieved the goals relating to shoe-tying, physical fitness, and self-calming that were included in the December 2010 IEP. Moreover, the March 2011 IEP's recommendation that K.T. continue to receive occupational and physical therapy make it clear that these services were still necessary. Accordingly, the March 2011 IEP does not address all of K.T.'s particular needs, given that it does not address the unattained goals set in the December 2010 IEP.

This Court concludes, however, that this procedural violation did not deny K.T. a FAPE. Although the March 2011 IEP omits the three annual goals relating to K.T.'s occupational and physical needs, it continues K.T.'s physical and occupational therapy programs. (Pltf. Ex. 6 (Dkt. No. 29) at 10) The March 2011 IEP also includes a transition plan – which was carried over from the December 2010 IEP – that sets goals relating to K.T.'s functional and occupational skills, including that he "will use supermarket circular[s] to choose items to be bought"; "will learn community signs for use in the community with adult supports"; "will learn various work task activities such as sorting and matching"; and "will participate in functional skills activities such as[] setting the table, [and] washing/drying dishes." (Id. at 11) These goals and programs appropriately address K.T.'s occupational and physical needs, and

41

thus the March 2011 IEP was "likely to produce progress, not regression," as required under the

IDEA. See R.B., 2013 WL 5438605, at *12 (internal quotation marks and citations omitted).

*       *       *       *

Because the goals and short-term objectives set forth in the December 2009,

December 2010, and March 2011 IEPs adequately addressed K.T.'s needs and set forth sufficient

methods and procedures for measuring his progress, this Court concludes that the record supports

the SRO's decision that these IEPs did not deny K.T. a FAPE.

### C.      The IEPs Adequately Addressed K.T.'s Speech and Language Needs

Plaintiff argues that (1) the speech-language program set forth in the December

2009 IEP did not comply with applicable New York regulations, and (2) none of the IEPs

adequately addressed K.T.'s speech-language needs. (Pltf. Br. (Dkt. No. 16) at 8-9, 15-17, 19-

20)

All three IEPs recommend speech-language therapy two times weekly for 30

minutes in a group of three. (Pltf. Ex. 3 (Dkt. No. 29) at 10; Pltf. Ex. 5 (Dkt. No. 29) at 12; Pltf.

Ex. 6 (Dkt. No. 29) at 12) "At the time [the 2009] IEP was prepared, [however,] New York

regulations required that '[i]nstructional services . . . be provided to meet the individual language

needs of a student with autism for a minimum of 30 minutes daily in groups not to exceed two,

or 60 minutes daily in groups not to exceed six.'" Scott ex rel. C.S. v. New York City Dep't of

Educ., 6 F. Supp. 3d 424, 439 (S.D.N.Y. 2014) (quoting 8 NYCRR § 200.13(a)(4) (amended

2010); P.K., 819 F. Supp. 2d at 109 n.9 (quoting pre-2010 regulation)) (emphasis added). The

current regulations – which became effective on December 8, 2010 – do not mandate the number

of sessions an autistic student must receive, but simply state: "Instructional services shall be

42

provided to meet the individual language needs of a student with autism." 8 NYCRR §
200.13(a)(4).

### 1.   <u>December 2009 IEP Speech-Language Provisions</u>

Because the December 2009 IEP recommends only two speech-language therapy
sessions per week – rather than daily sessions – it violates the applicable regulation existing at
the time the IEP was prepared.  However, neither the IHO nor the SRO acknowledged that the
December 2009 IEP violates 8 NYCRR § 200.13(a)(4).  The IHO found that, "[b]ased on the
credible testimony of Ms. Quinones and Ms. Charlene Torres, the student's speech teacher,
. . . the CSE's recommended program provided [K.T.] with sufficient instructional services to
meet his individual speech/language needs, <u>i.e.</u>, improve socialization skills, through classroom-
based instruction and recommended related services[.]"  (April 18, 2012 IHO Final Decision
(Dkt. No. 29) at 22-23)  And although the SRO acknowledged that "the parent contended that the
[DOE] failed to offer daily language instruction mandated for students with autism," he ruled
that "State regulations . . . do not dictate daily language instruction for all students with
autism[.]"  (SRO Decision (Dkt. No. 13) at 16 (citing 8 NYCRR § 200.13(a)(4))  For IEPs issued
in 2009, the SRO's ruling that state regulations did not "dictate daily language instruction for all
students with autism" is erroneous.

Because neither the IHO nor the SRO recognized that the applicable regulation –
as of December 2009 – requires daily instruction, this Court will not defer to their findings
concerning the question of whether the December 2009 IEP's provisions regarding speech-
language instruction denied K.T. a FAPE.

Although the December 2009 IEP violated New York regulations by providing
K.T. with two speech-language sessions per week, rather than the daily sessions that were

required under the existing regulations, "an IEP that does not contain the specific frequency and ratio requirements set forth in section 200.13(a)(4) is [not] per se legally inadequate." Scott, 6 F. Supp. 3d at 439 (deferring to "the IHO's and SRO's expertise and holdings" where the IHO and SRO "agreed that the IEP failed to comply with the [speech-language] regulation, [but] found that the noncompliance constituted only a procedural violation that did not rise to the level of denying [the student] a FAPE") (citing T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009)); see also S.A., 2014 WL 1311761, at *14 ("[P]laintiffs cite no legal authority, and the Court is aware of none, for the proposition that [violating the speech therapy] regulation . . . is a per se FAPE deprivation."). "Rather, the Court evaluates the speech-language IEP's legal adequacy in light of the student's particular needs." S.A., 2014 WL 1311761, at *14.

Here, the record demonstrates that the December 2009 IEP adequately addressed K.T.'s speech and language needs. The December 2009 IEP continues the previous IEP's recommendation that K.T. receive speech-language therapy two times per week for 30 minutes each.[13] (Pltf. Ex. 6 (Dkt. No. 29) at 12) The December 2009 IEP acknowledges that K.T. is "partially verbal," "understands a great deal of one-step commands," and "communicates with others by pointing to what he wants or needs." (Pltf. Ex. 6 (Dkt. No. 29) at 3) To improve K.T.'s speech and language skills, the 2009 IEP includes as goals that K.T. will increase both his reading and social interaction skills with 80% accuracy "as measured by teacher[-]made activities." (Id. at 6, 8) The 2009 IEP also includes a short-term objective addressing K.T.'s ability to play board games, which "would require [him] to follow directions and as such would

---

[13] The December 2008 IEP does not include the page listing the particular services K.T. would receive. See Pltf. Ex. 7 (Dkt. No. 29). That IEP states, however, that "[n]o [c]hange" was made to K.T.'s previous program, which recommended that K.T. receive speech services two times per week for thirty minutes each. See Pltf. Ex. 8 (Dkt. No. 29) at 13.

address [his] receptive language skills." (SRO Decision (Dkt. No. 13) at 17 (citing Pltf. Ex. 6 (Dkt. No. 29) at 8)

The record also includes a number of reports demonstrating that K.T. made progress in his speech-language skills under the previous two IEPs, indicating that it was appropriate to continue the speech-language program. For example, K.T.'s report card for the period between September 2007 and June 2008 states that he "show[ed] progress in demonstrating" the skill of "read[ing], writ[ing], listen[ing] and speak[ing] for social interaction." (Pltf. Ex. 54 (Dkt. No. 29) at 1-2) K.T.'s report card for the period between September 2008 and June 2009 states that he "show[ed] progress in demonstrating" the skills of "count[ing] to twenty" and "follow[ing] directions when working on independent tasks." (Pltf. Ex. 53 (Dkt. No. 29) at 1-2) Similarly, a report card for September and October 2009 states that K.T. is making progress on his goal of "[p]articipat[ing] in yoga activities independently" by responding to "many verbal prompts." (Pltf. Ex. 51 (Dkt. No. 29) at 1, 3) Given K.T.'s progress towards achieving goals involving expressive and receptive language skills while participating in a twice-weekly, group speech-language program, it was appropriate for the CSE to continue that program in December 2009.

This conclusion is buttressed by testimony from K.T.'s teachers, who testified that the December 2009 IEP's speech-language program adequately addressed his needs. Charlene Torres, K.T.'s speech teacher, testified that K.T. receives group – rather than individual – speech-language therapy in order to "increase his socialization skills"; Torres further testified that group therapy is "the right mandate for [K.T.]." (Tr. 350) Moreover, K.T.'s teacher –

45

Myrna Quinones – testified that she incorporates language acquisition into the classroom curriculum by "collaborat[ing] with the speech and language teacher."[14] (Tr. 115)

Plaintiff argues, however, that the speech-language services set forth in the December 2009 IEP "only address social interaction, rather than deficits in receptive and expressive language skills," and that "the classroom teacher has not attempted to work with [K.T.] on reading, at all, in at least two years." (Pltf. Br. (Dkt. No. 16) at 9) As discussed above, the goals relating to social interaction also allowed K.T. to practice his expressive and receptive language skills. With respect to K.T.'s reading skills – although Quinones testified that she had not worked with K.T. on "letter sounds" during the past two years – she has provided reading instruction to K.T., including "[p]re-academic skills [in] reading, basic reading, reading stories, matching pictures, [and] answering questions based on stories read." (Tr. 171-72) Moreover, the December 2009 IEP sets as a goal for K.T. that he will "develop his reading skills with 80% accuracy" within a year, and provides three short-term objectives for achieving this goal, including that K.T. "will read and identify items he likes from a fast food menu 8/10 times over a two week period." (Pltf. Ex. 6 (Dkt. No. 29) at 6)

---

[14] Plaintiff argues that Quinones's testimony should not be considered, because it is retrospective. (Pltf. Br. (Dkt. No. 16) at 9) In a different context, the Second Circuit has held that an "IEP must be evaluated prospectively as of the time of its drafting and therefore . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered. . . ." R.E., 694 F.3d at 186. This rule applies where "parents . . . reject an IEP they feel is inadequate, place their child in an appropriate private school, and seek tuition reimbursement from the school district." Id. (citations omitted). In such situations, the rule against retrospective testimony prevents the DOE from "defeat[ing] the parents' reimbursement claim . . . with evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services." Id. Here, however, Quinones's testimony regarding the incorporation of speech-language therapy in the classroom is not prohibited because K.T. was in fact educated in public school under the IEPs at issue. Accordingly, in considering whether the December 2009 IEP denied K.T. a FAPE, this Court has considered Quinones's testimony.

"Because the record reflects that the speech-instruction services recommended in the IEP, its noncompliance [with the New York regulation] notwithstanding, were determined with the use of . . . progress report[s] and the input of individuals familiar with [K.T.'s] needs, including [a] then-current [speech-language] provider[ ] and [K.T.'s teacher]," this Court finds that the December 2009 IEP adequately addressed K.T.'s speech-language needs.  See Scott, 6 F. Supp. 3d at 439 (finding no FAPE deprivation – despite violation of then-applicable regulation – where the student's IEP "recommended speech therapy three times weekly for 45 minutes in a group of three," because "the record reflects that the speech-instruction services recommended in the IEP . . . were determined with the use of [the school's] progress report and the input of individuals familiar with [the student's] needs, including then-current [school] providers and [his mother]"); see also S.A., 2014 WL 1311761, at *14-15 (finding no FAPE deprivation – despite violation of then-applicable regulations – where the student's IEP "provided for 1:1 speech-language therapy only once per week for thirty minutes and 2:1 speech-language therapy only twice per week for thirty minutes," because the record demonstrated that "the student had made progress toward his [previous] IEP goals[, including] understanding single-word vocabulary and following one-step directives," and because the student's speech-language therapist "recommended, and the CSE agreed, that the student should continue receiving speech-language therapy at the same rate to allow him to acquire new skills and apply his current skills").

## 2.     December 2010 IEP Speech-Language Provisions

The December 2010 IEP continues the recommendation that K.T. receive speech-language therapy two times weekly for 30 minutes in a group of three.[15]  (Pltf. Ex. 5 (Dkt. No.

---

[15]  Given the 2010 amendment to the applicable regulation – 8 NYCRR § 200.13(a)(4) – this recommendation did not violate New York law.

29) at 12)  The 2010 IEP indicates that K.T. has similar speech-language abilities and needs as in the previous year.  See, e.g., id. at 3 (noting that K.T. "communicates using short sentences and phrases to express his wants and needs" and "can follow 1 and 2 step directions").  Plaintiff argues that, despite K.T.'s severe language deficit, "expressive and receptive language skills were never addressed" by K.T.'s teacher or speech-language therapist.  (Pltf. Br. (Dkt. No. 16) at 16)  Plaintiff contends that the CSE should have "increase[d] his speech services at the December 2010 meeting."  (Id.)

   The SRO notes, however, that "although not specifically identified as speech-language goals, the CSE incorporated annual goals and short-term objectives that addressed both the student's expressive and receptive language skills."  (SRO Decision (Dkt. No. 13) at 27)  These goals include that K.T. "will take turns appropriately in a group activity by verbalizing 'my turn,'" and that in response to the question, "Where does this picture go?", K.T. "will place the picture in the correct category[.]"  (Pltf. Ex. 5 (Dkt. No. 29) at 6)  Moreover, K.T. demonstrated progress in the social interaction goals included in the December 2009 IEP, thus indicating that the continuation of his previous speech-language program was appropriate.  See Pltf. Ex. 45 (Dkt. No. 29) at 3, 6; see also S.H., 2011 WL 6108523, at *10 ("Although past progress is not dispositive, it does 'strongly suggest that' an IEP modeled on a prior one that generated some progress was 'reasonably calculated to continue that trend.'") (quoting Thompson, 540 F.3d at 1153).  Accordingly, this Court finds that the SRO's conclusion that the speech-language provisions of the December 2010 IEP did not deny K.T. a FAPE is supported by the record.

### 3.     March 2011 IEP Speech-Language Provisions

The March 2011 IEP continues to recommend that K.T. receive speech-language therapy two times weekly for 30 minutes in a group of three.  (Pltf. Ex. 3 (Dkt. No. 29) at 10)  It also adopts annual goals and short-term objectives that address K.T.'s expressive and receptive skills.  See id. at 7 ("[K.T.] will be able to identify and exchange items needed during an activity with another student by giving and/or receiving objects given visual prompting and verbal cues"; "[K.T.] will take turns appropriately in a group activity by verbalizing 'my turn'"; "When shown a picture of a classmate . . . [K.T.] will go over to that student and greet them by shaking their hand, with prompting and verbal cues"; "When asked, 'Where does this picture go?' [K.T.] will place the picture in the correct category.").  The SRO found – and this Court agrees – that "there is nothing in the hearing record that indicates that [K.T.'s] speech-language needs had changed since the previous December 2010 CSE meeting."  (SRO Decision (Dkt. No. 13) at 31)  Moreover, a student progress report states that – although K.T. had made "little progress" on these goals by mid-February 2011 – his teacher anticipated that he would meet his goals given more time.[16]  (Pltf. Ex. 38 (Dkt. No. 29) at 3)

Plaintiff argues that, "[i]n light of [K.T.'s] minimal progress [between December 2009 and March 2011], it was completely unreasonable to expect the previous program to yield progress in the future."  (Id. at 20).  The reports in the record demonstrate, however, that during the approximately three-month period between December 20, 2010 and March 7, 2011, K.T. made some progress with respect to the goals in the December 2010 IEP that address expressive and receptive language skills.  See, e.g., Pltf. Ex. 38 (Dkt. No. 29) at 3; Pltf. Ex. 43 (Dkt. No. 29)

---

[16]  By June 2011, K.T. had in fact made progress on achieving the speech-language related goals in the March 2011 IEP.  (Pltf. Ex. 38 (Dkt. No. 29) at 3)

at 2-3 (indicating that, during December 2010 and January 2011, K.T. had made progress on several speech-and-language-related goals, including that "[K.T.] will answer basic questions about a text he has listened to," and "[K.T.] will identify community signs with limited verbal prompting"). "Relying on these evaluations, . . . it was not unreasonable for [the] CSE to propose an IEP virtually identical to [the IEP issued three months earlier]." J.G. ex rel. N.G. v. Kiryas Joel Union Free School Dist., 777 F. Supp. 2d 606, 650 (S.D.N.Y. 2011). "Moreover, the consistency of the evaluations in acknowledging that [K.T.] had made some progress, however modest, by following his previous IEP . . . supported the [CSE's] decision not to deviate from what was working." Id. Accordingly, the SRO's conclusion that it was reasonable for the CSE to continue K.T.'s speech-language services from his December 2010 IEP is supported by the record.

*     *     *     *

Although the speech-language program provided in the December 2009 IEP does not comply with the applicable regulation then in effect, this Court concludes that this is a procedural violation that does not rise to the level of denying K.T. a FAPE. Because the record supports the SRO's conclusion that the December 2009, December 2010, and March 2011 IEPs adequately addressed K.T.'s speech and language needs when the IEPs were formulated, this Court concludes that any deficiency in the IEPs' speech-language requirements did not deny K.T. a FAPE.

### D.    Failure to Conduct Functional Behavior Assessments Did Not Deny K.T. a FAPE

Plaintiff also contends that DOE's failure to conduct a functional behavior assessment of K.T. in connection with the December 2009 and December 2010 IEPs denied K.T. a FAPE. (Pltf. Br. (Dkt. No. 16) at 10-12, 17)

50

A functional behavioral assessment, or "FBA," provides an "identification of [a disabled student's] problem behavior, [its] definition . . . in concrete terms, the . . . contextual factors that contribute to [it] . . . and the formulation of a hypothesis regarding the general conditions under which [the] behavior usually occurs." 8 NYCRR § 200.1(r) (alterations added). "A school district is required to conduct an FBA only where it determines that the behavior at issue is sufficiently serious as to 'impede' the student's learning and where such an assessment is 'necessary' to ascertain the causes of the problematic behavior." M.S. v. New York City Dep't of Educ., 2 F. Supp. 3d 311, 324 (E.D.N.Y. 2013); see M.W., 725 F.3d at 140 ("The IDEA only requires a school district to 'consider the use of positive behavioral interventions and supports, and other strategies' when a child's behavior impedes learning.") (quoting A.C., 553 F.3d at 172).

Moreover, "[t]he failure to conduct an FBA does not automatically constitute denial of a FAPE[;] when an IEP adequately addresses a child's interfering behaviors, the procedural requirements of the IDEA are satisfied." M.L., 2014 WL 1301957, at *9 (citing A.C., 553 F.3d at 172); see N.S., 2014 WL 2722967, at *8 (finding that the failure to conduct an FBA "does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior") (quotation marks and citation omitted).

IEPs sometimes address a student's interfering behavior through a behavioral intervention plan ("BIP"), which is "a plan that is based on the results of a functional behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs[,] and intervention strategies that include positive behavioral supports and services to address the behavior." 8 NYCRR §

200.1(mmm). "Where the IEP actually includes a [behavioral intervention plan], parents [challenging an IEP] should at least suggest how the lack of an FBA resulted in the BIP's inadequacy or prevented meaningful decision-making." M.W., 725 F.3d at 140 (citing R.E., 694 F.3d at 189-90). "[W]hether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers.'" Id. (citing A.C., 553 F.3d at 172).

### 1.    December 2009 IEP – Failure to Conduct an FBA

Here, the CSE did not arrange for a functional behavior assessment of K.T. prior to formulating the IEPs at issue, but it did develop a behavioral intervention plan for each of the IEPs. See Pltf. Exs. 3 at 4, 5 at 14, 6 at 16 (Dkt. No. 29). With respect to the December 2009 IEP, the SRO found that it "contained information regarding the student's behavioral needs that was used to develop" "an adequate and appropriate BIP." (SRO Decision (Dkt. No. 13) at 19-20) The record supports the SRO's conclusion.

The December 2009 IEP notes that K.T's "[b]ehavior seriously interferes with instruction and requires additional adult support," and that the "[c]lassroom teacher, classroom para[-]professional, and other related service providers" offer this support to him. (Pltf. Ex. 6 (Dkt. No. 29) at 4) The IEP also describes K.T.'s social and emotional behavior in detail, stating that his "mood and personality change without the staff or teacher realizing the antecedent behavior or underlying cause"; that he "is often restless"; that he "can be verbally and physically aggressive, many times for no apparent reason"; and that "[at] times he engages in self-abusive behaviors such as punching himself in the head, scratching himself, and eating staples." (Id.) The IEP provides strategies for reducing or addressing K.T.'s behavioral interference, such as

"[c]onstant praise and other forms of positive reinforcement," and "prompts/redirection to maintain attention and focus." (Id.)

The December 2009 IEP also includes a BIP, which (1) describes K.T.'s interfering behaviors, (2) discusses how those behaviors are expected to change, and (3) provides strategies for changing those behaviors. (Id. at 16) The BIP states that K.T. "has significant difficulties paying attention and maintaining concentration"; "has difficulty controlling and expressing his emotions and poor anger management"; and "often engages in self-abusive behaviors such as punching himself, banging fists on tables, [and] eating staples." (Id.) The BIP also lists several strategies that will be employed to change K.T.'s behavior, including "[p]rovid[ing] constant reinforcement in the form of tangible rewards (i.e., cookies, tokens to exchange for chosen reinforcer) and privileges (i.e., computer, puzzles, music)." (Id.) The BIP also states that K.T. will suffer "consequences for poor behavior[,] including loss of privileges, removal from [his] desk, [and] [reprimands]." (Id.) The BIP provides that K.T.'s related services providers will reinforce the classroom goals; that he will receive "ongoing support from classroom para[-]professionals"; and that there will be "[o]ngoing communication between[ ] teacher, parent, related service providers, [and an] outside pediatrician." (Id.)

This Court concludes – as to the December 2009 IEP – that "the BIP was consistent with the information available to the CSE and that the intervention services were adequate because they provided a broad, collaborative approach to implement specific strategies to modify those behaviors. . . ." See M.W., 725 F.3d at 141 (finding that the student was not denied a FAPE – despite the absence of an FBA – where "the BIP recommended that [the student] be provided with a reward system, praise, encouragement, and positive modeling to learn to adjust his behavior within a collaborative support system between parent, teacher, and

paraprofessional"). Both the IEP and the attached BIP adequately identify K.T.'s interfering behavior – e.g., that he has difficulty paying attention and controlling his emotions, and that he engages in self-abusive behavior – and provide strategies to address that behavior – e.g., by providing constant praise and positive reinforcement, imposing discipline where necessary, and maintaining communication among his parents, teachers, and related services providers. Accordingly, the SRO's finding that the absence of a functional behavior assessment in connection with the December 2009 IEP did not deprive K.T. of a FAPE is supported by the record.

### 2.    December 2010 IEP – Failure to Conduct an FBA

The December 2010 IEP includes behavioral descriptions and strategies that are similar to those in the December 2009 IEP. It notes that K.T.'s behavior "seriously interferes with instruction and requires additional adult support," and that he "sometimes displays anger and/or negative behavior and may become verbally abusive and/or self-abusive when he becomes frustrated, irritated or when he is 'caught' doing something." (Pltf. Ex. 5 (Dkt. No. 29) at 4) The 2010 IEP also states that certain strategies are helpful in improving K.T.'s behavior, and that "constant positive reinforcement and loss of priv[i]leges are implemented into the daily routine." (Id.) The 2010 IEP reports that "it is best to engage [K.T.] in work task activities with constant verbal prompting in order to keep him occupied," and that although he often refuses to do his work, "positive verbal prompting and modeling to initiate the activity will usually help to get him started." (Id.) The December 2010 IEP also includes a BIP, which is similar to the BIP prepared for the December 2009 IEP. It describes the same interference behaviors, and adopts several of the strategies from the December 2009 BIP. See id. at 14.

54

The SRO notes that K.T. "continue[d] to have behaviors that interfered with his learning, [and accordingly] the [December 2010] IEP carried over provision of the strategies used to address[ ] the student's social/emotional management needs from the previous IEP, including provision of constant praise and other forms of positive reinforcement; prompts and redirection to maintain attention and focus; and instruction, modeling, and reinforcement of social skills." (SRO Decision (Dkt. No. 13) at 28)

For the same reasons discussed above, this Court finds that the December 2010 IEP "adequately identifies [K.T.'s] behavioral impediments and implements strategies to address that behavior." See N.S., 2014 WL 2722967, at *8 (quotation marks and citation omitted). The behavioral impediments noted in the IEP are consistent with the evaluative information available to the CSE at the December 2010 IEP meeting, and the IEP and BIP provide strategies to improve K.T.'s behavioral performance. Accordingly, the failure to conduct an FBA in connection with the December 2010 IEP did not deny K.T. a FAPE.

### 3.      **March 2011 IEP – Failure to Conduct an FBA**

With respect to the March 2011 IEP, Plaintiff contends that "[t]he SRO sidestepped the critical issue that the [DOE] did not address K.T.'s school refusals, either via a functional behavior assessment or within the IEP." (Pltf. Br. (Dkt. No. 16) at 20) Defendants argue that "Plaintiff['s] attempt to raise this issue without amending [her] due process complaint at the impartial hearing level [is] improper," and that Plaintiff "should not be permitted to 'sandbag' the school district by raising issues [she] had ample time to fold into [her] due process complaint prior to or during the official hearing itself." (Def. Br. (Dkt. No. 22) at 13 (quotation marks and citations omitted))

"In order to challenge an IEP, parents must first file a 'due process complaint' listing the alleged deficiencies." C.F., 746 F.3d at 73 (citing 20 U.S.C. § 1415(b)(7)(A)). The due process complaint "must list all of the alleged deficiencies in the IEP." R.E., 694 F.3d at 187 (footnote omitted). "An important feature of the IDEA is that it contains a statutory 30-day resolution period once a 'due process complaint' is filed." Id. (citing 20 U.S.C. § 1415(f)(1)(B)). When claims are "not raised in the due process complaint, the [DOE] [does] not have a chance to respond to or remedy them, and [thus] they are not appropriate bases for relief. . . ." T.G., 973 F. Supp. 2d at 336. This "waiver rule is not to be mechanically applied," however. C.F., 746 F.3d at 78. "[T]he IDEA itself contemplates some flexibility," and "[t]he statute does not require that alleged deficiencies be detailed in any formulaic manner." Id. (citing 20 U.S.C. § 1415(b)(7)(A)(ii)).

Here, the due process complaint that Plaintiff filed on December 9, 2011, does not mention K.T.'s refusal to attend school, nor does Plaintiff point to any language in that complaint that would have provided "fair notice" to the DOE of Plaintiff's claim concerning K.T.'s refusal to attend school. See Due Process Cmplt. (Dkt. No. 29); C.F., 746 F.3d at 78.

At the impartial hearing, however, the DOE did receive notice of Plaintiff's claim regarding K.T.'s refusal to attend school. Moreover, the IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [due process complaint], unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B) (emphasis added). Here, the DOE elicited testimony from a DOE witness – Assistant Principal Eleyna Rivas – concerning K.T.'s refusal to attend school:

> MR. AUERBACH: What is his attendance like for the 2011/2012 school year?
>
> MS. RIVAS: . . . . I believe the last time he attended was the beginning of November. His attendance has been sporadic since September. . . .
>
> MR. AUERBACH: Do you know why he hasn't been attending?
>
> MS. RIVAS: As of now my understanding is it's probably because Mom was going through the process of finding a different program.

(Tr. 224-25).

The IHO also questioned Rivas about K.T.'s refusal to attend school. See, e.g., Tr. 194-95 ("In or around November 2011 when [K.T.] stopped regularly attending school, what if anything did you do? . . . . Did you speak to [the principal] about [K.T.'s] degree of attendance or non-attendance from November 2011 to the present time?") (Rivas testimony). Plaintiff also raised the refusal to attend school claim in her closing brief (IHO Ex. XI (Dkt. No. 29) at 7-8), which the IHO accepted in lieu of closing argument at the impartial hearing. (Tr. 718-19)

That the DOE did not object to this testimony and argument – and in fact questioned its own witness about K.T.'s refusal to attend school – suggests that the DOE had adequate notice of Plaintiff's claim regarding K.T.'s refusal to attend school, and implicitly agreed to litigate this issue before the IHO. See C.F., 746 F.3d at 78 ("[T]he issue of the unavailability of the proposed site . . . was raised at the hearing – by one of the Department's witnesses. . . . That claim, therefore, was properly raised before both the SRO and the district court.") (emphasis in original); see also M.H., 685 F.3d at 250 (allowing plaintiffs to raise a claim at the impartial hearing that was not made in the due process complaint where "much of the testimony presented by both parties to the IHO related to [that issue]," and where "the DOE . . . introduced [that issue]").

Even assuming arguendo that the DOE had adequate notice of Plaintiff's claim regarding K.T.'s refusal to attend school, and agreed to litigate the issue at the impartial hearing, that claim provides no basis for relief here, however. The record establishes that K.T.'s refusal to attend school did not begin until eight months after the CSE formulated the March 2011 IEP. Although Plaintiff argues that "K.T.'s school refusals began shortly after a January 2010 incident on the school bus," see Pltf. Br. (Dkt. No. 16) at 21 (citing Tr. 101, 108, 627, 629-31, 674-77, 700-02), the evidence at the hearing demonstrates that K.T.'s refusal to attend school did not begin until the fall of 2011. See Tr. 194 (during the 2010-11 school year, "[K.T.] had good attendance" and "was rarely out") (Quinones testimony); Tr. 224 ("I believe the last time [K.T.] attended was the beginning of November [2011]. His attendance has been sporadic since September.") (testimony of Assistant Principal Rivas); Tr. 630 ("in August or September of 2011 . . . [K.T.] really started consistently not wanting to go [to school]," and he began refusing to attend school in "November of 2011") (testimony of Peter Doran, the Medicaid Services Coordinator for Services for the Developmentally Challenged).

Plaintiff contends that the SRO improperly "decline[d] to address whether such refusals should have triggered CSE action in this [case]." (Pltf. Br. (Dkt. No. 16) at 21, see also id. at 20 ("The SRO sidestepped the critical issue that the [DOE] did not address K.T.'s school refusals, either via a functional behavior assessment or within the [March 2011] IEP."); id. at 23 ("The failure to address K.T.'s escalating school refusals renders the March 2011 IEP inappropriate. . . .")) However, "[i]n determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision." R.E., 694 F.3d at 187 (citation omitted); id. ("[T]he measure and adequacy of [an] IEP can only be determined as of

58

the time it is offered to the student, not at some later date.") (quoting Fuhrmann ex rel. Fuhrmann

v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1039-40 (3d Cir. 1993)) (alteration in R.E.). Here,

the record indicates that K.T.'s refusal to attend school did not begin until the fall of 2011, well

after the CSE prepared the March 2011 IEP. Because this Court's review of the March 2011 IEP

addresses the adequacy of the IEP at the time it was offered to K.T., and not at some later date,

see R.E., 694 F.3d at 187, this Court cannot consider K.T.'s refusal to attend school in the fall of

2011 in determining whether the March 2011 IEP denied K.T. a FAPE. Accordingly, the SRO

acted properly in refusing to consider K.T.'s refusal to attend school in determining the adequacy

of the March 2011 IEP. See SRO Decision (Dkt. No. 13) at 32 n.41 ("While [K.T.'s refusal to

attend school] is troubling information regarding the student and could well form the basis of

other claims that may be raised in a complaint by the parent in another proceeding, it is not

relevant to this proceeding for the purpose of determining whether the preceding March 2011

IEP was appropriate at the time it was formulated.").[17]

---

[17]  Plaintiff argues that the DOE's "failure to convene a CSE to develop strategies to manage
K.T.'s school refusals constitutes a denial of a free appropriate public education." (Pltf. Br.
(Dkt. No. 16) at 23)  Plaintiff cites a number of cases for the proposition that "absenteeism
relating to a student's disability must be addressed by the student's special education program."
(Id. at 21-22)  These cases address a student's inability or refusal to attend school in determining
whether the student is eligible for "special education services," however, and not whether a
school has properly addressed absenteeism by a student who is receiving services. See Johnson
v. Metro Davidson Cnty. Sch. Sys., 108 F. Supp. 2d 906, 918-19 (M.D. Tenn. 2000); Bd. of
Educ. of Montgomery Cnty. v. S.G., No. Civ.A. 2005-0323 (DKC), 2006 WL 544529, at *14-15
(D. Md. Mar. 6, 2006), aff'd sub nom. Bd. of Educ. of Montgomery Cnty., Maryland v. S.G.,
230 Fed. Appx. 330 (4th Cir. 2007); Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138,
149-150 (2d Cir. 2002).

Even if improper handling of absenteeism could result in the denial of a FAPE, the record here
demonstrates repeated efforts by school personnel to arrange for K.T.'s return to school. K.T.'s
teacher contacted both K.T. and his mother in an attempt to persuade them to have K.T. return to
school. (Tr. 201-04)  K.T.'s mother was also invited to a January 2012 CSE meeting at which
the attendance issue was discussed, but she did not attend. (Tr. 200-01)  An "attendance teacher"
also made a home visit in an attempt to persuade K.T. to return to school. (Tr. 225, 230-31, 261,
269)  School representatives were told that K.T.'s mother was not going to send K.T. to school

E.      **Failure to Provide for Parental Training and**
        **Counseling in the IEPs Did Not Deny K.T. a FAPE**

Plaintiff argues that the IEPs did not provide for parental training and counseling

as required by state regulations, and thus the IEPs denied K.T. a FAPE. (Pltf. Br. (Dkt. No. 16)

at 12-13, 21-22, 24) "New York law requires school districts to include [in the IEP] parent

counseling and training." C.F., 746 F.3d at 79 (citing 8 NYCRR §§ 200.1(kk); 200.13(d)).

"'Parent counseling and training means assisting parents in understanding the special needs of

their child; providing parents with information about child development; and helping parents to

acquire the necessary skills that will allow them to support the implementation of their child's

individualized education program.'" R.E., 694 F.3d at 191 (quoting 8 NYCRR § 200.1(kk)).

The Second Circuit has "described counseling omissions as procedural violations 'less serious

than the omission of an FBA' because 'the presence or absence of a parent-counseling provision

does not necessarily have a direct effect on the substantive adequacy of the plan.'" M.W., 725

F.3d at 141 (quoting R.E., 694 F.3d at 191). "Moreover, because school districts are required by

section 200.13(d) to provide parent counseling, they remain accountable for their failure to do so

no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are

not receiving this service." R.E., 694 F.3d at 191.

Consequently, the "failure to provide counseling ordinarily does not result in a

FAPE denial. . . ." M.W., 725 F.3d at 141 (citation omitted). "This is especially so when the

parents have 'received extensive parent training in the past and have been actively involved in

their child's education, communicating regularly with teachers and service providers.'" M.L.,

---

anymore because he did not want to come to school, and his mother was seeking a different
program for him. (Tr. 225) Given this record, this Court cannot find that DOE personnel
engaged in conduct in 2011 that deprived K.T. of a FAPE.

2014 WL 1301957, at *8 (quoting <u>M.M. ex rel. A.M. v. New York City Dep't of Educ.</u>, 583 F.

Supp. 2d 498, 509 (S.D.N.Y. 2008)). <u>See also A.D.</u>, 2013 WL 1155570, at *12 n.5 (finding that

the omission of parental counseling did not render the IEP inadequate where "the Parents have

had adequate access to [such services] for several years," including weekly phone calls and "very

good communication" with the school); <u>F.L. ex rel. F.L. v. New York City Dep't of Educ.</u>, 11

Civ. 5131 (RKE), 2012 WL 4891748, at *10 (S.D.N.Y. Oct. 16, 2012) (finding no denial of a

FAPE where "parent training was discussed at the IEP meeting" and evidence showed that the

training was available at the assigned school), <u>aff'd</u>, 553 Fed. Appx. 2 (2d Cir. 2014); <u>E.F.</u>, 2013

WL 4495676, at *22 (the omission of parental counseling "does not amount to a denial of a

FAPE" because parents "received . . . training in prior years and under New York law they could

petition to have [it] . . . if it was not offered"). In sum, "while a failure to provide parent

counseling and training may -- in combination with other deficiencies -- <u>contribute</u> to denial of a

FAPE, . . . it alone is insufficient to rise to the level of denial thereof." <u>F.B.</u>, 923 F. Supp. 2d at

585 (internal citation omitted) (emphasis in original).

          Here, the three IEPs at issue do not provide for parental counseling and training.

<u>See</u> Pltf. Exs. 3, 5, 6 (Dkt. No. 29). Testimony at the impartial hearing demonstrated, however,

that Plaintiff had access to counseling services at K.T.'s school, and that teachers and other

school representatives frequently communicated with her. For example, the assistant principal --

Eleyna Rivas -- testified that the school has a "family night" during which it "invite[s] parents to

come in for different workshops," and that the school "send[s] fliers" to parents about these

workshops. (Tr. 226-27) Rivas also testified that the school's parent coordinator and teachers

reach out to parents. (Tr. 227) Moreover, K.T.'s teacher -- Myrna Quinones -- testified that she

has a "good rapport" with Plaintiff, that she and Plaintiff have "spoke[n] many times," and that

Plaintiff "would call [Quinones] anytime she had questions or anything [was] going on at home." (Tr. 108) Quinones also testified that Plaintiff was involved with the school, that she "came to school meetings," and that she "always" contacted Quinones if there were issues with K.T. (Tr. 167)

Because "a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP," R.E., 694 F.3d at 185, Rivas's and Quinones's testimony regarding the parental counseling services available to Plaintiff do not establish that the IEPs complied with the applicable regulations. However, the absence of a parental counseling provision in an IEP does not result in a denial of a FAPE where, for example, "the parents have 'received extensive parent training in the past and have been actively involved in their child's education, communicating regularly with teachers and service providers.'" M.L., 2014 WL 1301957, at *8 (quoting M.M., 583 F. Supp. 2d at 509). Here, the record indicates that Plaintiff has been actively involved in K.T.'s education through communications with K.T.'s teacher and contact with his school, and that she had opportunities to attend workshops for parents at K.T.'s school. Accordingly, this Court agrees with the SRO's finding that the DOE's "failure to incorporate parent counseling and training into the [IEPs] was a violation of State regulation, but it did not rise to the level of a denial of a FAPE to the student." (SRO Decision (Dkt. No. 13) at 21; see also id. at 29, 32-33)

**F.      Cumulative Effect of Procedural Violations Did Not Deny a FAPE to K.T.**

Plaintiff also argues that the cumulative effect of the various procedural violations amounts to the denial of a FAPE. "Even if no singular procedural violation in an IEP considered alone denies the student a FAPE, such violations may result in the denial of a FAPE when considered cumulatively." M.L., 2014 WL 1301957, at *10 (citing R.E., 694 F.3d at 190). Here,

this Court has identified two procedural violations that exist in all three IEPs: (1) the record does not demonstrate with specificity that the CSE reviewed particular evaluative reports and materials; and (2) the IEPs do not provide for parental counseling and training. Moreover, the December 2009 IEP did not comply with New York regulations then in effect governing speech-language programs, and the March 2011 IEP does not include certain goals relating to K.T.'s occupational and physical needs.

These deficiencies, even when considered cumulatively, did not deny a FAPE to K.T., however. "[F]or the reasons explained above, [these deficiencies] are more formal than substantive." F.B., 923 F. Supp. 2d at 586 (footnote omitted). The IEPs are consistent with the evaluative information available to the CSE and they adequately address K.T.'s behavioral interference problems. Plaintiff's active involvement in K.T.'s education indicates that the absence of a parental counseling provision in the IEPs did not cause K.T. any harm. Similarly – although the speech-language program set forth in the December 2009 IEP does not comply with regulations in effect at the time – the IEP as a whole adequately addressed K.T.'s speech and language needs. Finally, the March 2011 IEP addresses K.T.'s occupational and physical needs by continuing his therapy in those areas, and by providing a number of goals that are aimed at developing his functional and occupational skills. Accordingly, this Court finds that any procedural violations in the December 2009, December 2010, and March 2011 IEPs did not – even when considered cumulatively – deny K.T. a FAPE.

\*       \*       \*       \*

Because this Court concludes that the SRO did not err in finding that the DOE provided K.T. with a FAPE for 2009, 2010, and 2011, Plaintiff's request for compensatory educational services is denied.

## CONCLUSION

Defendant's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.[18] The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 12, 19).

Dated: New York, New York
      March 23, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[18] The Complaint pleads a second cause of action seeking attorneys' fees and costs, based on "an interim order dated January 17, 2012, [in which] the IHO ordered the [DOE] to initiate evaluations for occupational therapy, physical therapy, speech/language [therapy], [and] assistive technology . . ., as well as a neuropsychological evaluation and a functional behavioral assessment." (Cmplt. (Dkt. No. 1) ¶¶ 65-68) The parties did not move for summary judgment on this claim, see Dkt. Nos. 12, 19, and their briefs do not discuss it. See Dkt. Nos. 16, 22, 23, 28. Accordingly, it remains unresolved.